Texas Building Company v. Drs. Albert. & Edgar.

Decided November 24, 1909.

**1.—Master and Servant—Foreman—Injured Employe—Authority to Employ—Surgeon.**

A construction company was engaged in a building contract at a town remote from its general place of business, where a foreman was in charge of its work and the servants engaged in it. One of these being seriously injured in such service, the foreman employed surgeons to attend to his injuries, under circumstances demanding such attention immediately and making it impracticable for the general officers of the company to act therein. Held, that the company became liable to the surgeons so employed for reasonable compensation for their services.

**2.—Same—Duty of Master.**

It seems that in case of emergency where an employe is seriously injured and immediate medical attention demanded, the master is under a duty to furnish same, and its foreman or representative highest in authority present and able to act for it, though not authorized to make such contract for it, would have an implied authority to do so and to bind the master thereby.

**3.—Same—Interest of Master.**

It seems also, that, irrespective of the existence of a legal duty on the part of the master to furnish medical aid to an injured servant, the master has an interest in having such aid furnished which would imply authority to take action to that end by an employee not otherwise empowered to so act for the master, if he were in charge of the work being done and the only one who could take such necessary action in the master's interest.

Error from the County Court of Childress County. Tried below before Hon. W. B. Howard.

*G. E. Hamilton,* for plaintiff in error.—The facts being undisputed that the physicians who are plaintiffs in this case were summoned by some spectator to attend the injured man, and responded to that call, and not to any call or request of plaintiff in error, and were never employed by plaintiff in error, and were not promised anything by it or any of its agents for any services they rendered to Keasler, the law will not hold plaintiff in error liable to said physicians for the services they rendered him. Cotnam v. Wisdom, 104 S. W., 165; Morrell v. Lawrence, 101 S. W., 572; Wood on Master & Serv., sec. 70; Boyd v. Sappington, 4 Watts, 247.

Where a person is injured, sick or disabled, and a spectator calls a physician to his relief, the injured, sick or disabled person is liable to the physician for his services, and not the party who summoned the doctor, or any other person, unless an express promise to pay for such services was made by such other person. Same authorities.

Mere acquiescence of a third party who stands by and sees a physician rendering services to a patient will not bind such third party to pay for such services. Crane v. Baudouine, 55 N. Y., 256; Boyd v. Sappington, 4 Watts, 247; Rankin v. Beale, 68 Mo. App., 325; Edelman v. McDonell, 126 Cal., 210; Morrell v. Lawrence, 101 S. W., 572.

An agent of a corporation whose authority is not general, but is

limited, unless specially authorized by his employer, can not bind his corporate principal for medical services rendered the employes of such corporation, either by express or implied promises that his principal will pay for such services, unless such an emergency arises that renders it imperative for a physician to be employed by such agent to save the life of such employe, or to prevent serious consequences; and when such emergency exists, before the physician can recover of the employer, it must be shown that the agent actually employed the physician. Reynolds v. Chicago, B. & Q. Ry. Co., 90 S. W., 100; St. Louis, Ark. & T. Ry. Co. v. Hoover, 13 S. W., 1092; Malone v. Robinson, 12 So., 709.

In the absence of a contract to furnish medical treatment, there is no legal obligation resting upon the master to provide medical attendance for an employe who has been injured in the performance of his duties. 20 Am. & Eng. Enc. Law, 52 (2d ed.), and authorities there cited; Cairo & St. L. Ry. Co. v. Mahoney, 82 Ill., 73, 25 Am. Rep., 299.

*Jos. H. Aynesworth,* for defendants in error.—The court did not err in rendering judgment for the plaintiffs for the amount sued for for the reason that plaintiffs had been requested to do what they could for the wounded man and it was contemplated by all parties that surgical and medical attention was what was desired at that time and there was an implied promise to pay for such services. Clarke & Skyles on Agency, 160, 611; Cairo & St. L. Ry. Co. v. Mahoney, 25 Am. Rep., 299; Terre Haute Ry. Co. v. McMurray, 49 Am. Rep., 752; Case Note in 28 L. R. A., 546, and also in 4 L. R. A., New Series, 49, where the cases are discussed.

RICE, Associate Justice.—This suit was originally brought in the Justice's Court by defendants in error, Drs. J. W. Albert and C. L. Edgar, a firm of practicing physicians residing at Childress, against plaintiff in error for the recovery of $175, claimed to be due them for professional services rendered to J. D. Keasler, an employe of plaintiff in error. Judgment was rendered for defendants in error for the amount of their demand, $25 of which having been remitted, plaintiff in error appealed to the County Court, where the case was tried by the court without a jury, resulting in a judgment for defendants in error for the sum of $150, from which this writ of error is sued out.

The only ground urged for reversal is that the evidence does not sustain the judgment. A brief summary of the evidence, therefore, is necessary to determine the question involved. Plaintiff in error is a private corporation organized for the purpose of doing a building and construction business, its principal office being in Ft. Worth, Texas, with James J. Taylor as its president and general manager, and at the time of the accident to Keasler it had ten or twelve crews of men working for it in different sections of the country, one of which was at Childress, who were then engaged in the construction of a store-room in the yards of the Ft. Worth and Denver City Railway Co., at said place. Wm. Barnes was the foreman of the crew at

Childress engaged in said work, and said Keasler was one of the employes working for said company under the direction of said foreman. The duties of said foreman were to superintend and direct the movements of said crew, to employ and discharge men, and pay them off; but it was shown that generally he had no authority to employ physicians or surgeons to attend the sick or injured employes. On the morning of May 4, 1907, Keasler, with other employes, was sent by Barnes, the foreman, to unload a car of brick standing on the railway track in the "Denver Yards." Finding it necessary to move the car a short distance down the track before unloading the brick, Keasler, after the brake had been loosened, started the car to rolling with a.pinch bar. Seeing that the car was likely to go too far before stopping he ran ahead and stuck the bar in front of the wheel of the moving car, which ran on to the bar, throwing him under the car running over his legs. Barnes, who was not present at the time, was immediately notified of the accident, and soon arrived on the scene and was informed that someone had already telephoned for a.doctor. As Barnes and the other employes of plaintiff in error were carrying Keasler on a litter into his own home, some 150 yards from where he was injured, defendants in error arrived in response to. said phone call, which had been put in for them by someone whose identity was never established, and, under the direction of Barnes, began at once to administer to his relief. These physicians were the local surgeons of the railway company, and when first called supposed that it was to attend some of its employes. One of the physicians, however, knew both Barnes and Keasler,. and knew that the one was the foreman and the other the employe of plaintiff in error. It was shown that Barnes, the foreman, was very solicitous for the welfare of Keasler, and seemed to be in general charge and management upon arrival of said physicians, and that he told both of them that he wanted them to do all in their power for him. Keasler was a very poor man, and it is shown that after he had been carried into the house Barnes stated to him and his wife, who were in distress and grieving over the fact of their poverty, that they need not worry about that, but to get whatever was necessary, and that he would see that it was paid for. It was further shown that Barnes was the highest in authority at this place representing the plaintiff in error at the time of the accident, and there is testimony to the effect that he offered. to secure the services of a specialist, if needed, and further proffered to send the injured man and his family in a Pullman to the hospital at Ft. Worth, but that his wife objected to leaving home. Both of Keasler's legs had been so injured that it became necessary for said physicians to amputate them, but Keasler died within a few days from the effects of his injuries. The general manager of the company, Taylor, who was present at the time of the funeral, paid the funeral expenses from his individual funds. While Barnes did not call in these physicians, yet he testified that he would have done so if they had not already been.phoned for when he arrived. He stated that while he told them to do all that they could for the injured man, and that he was very anxious in his behalf; still he did not promise

them either that the company or himself would pay for their services. But Dr. Edgar testified that he supposed from Barnes' actions at the time and what he said, that the company would pay for their services.

The sole question for our determination then is whether these facts warranted the court in rendering judgment for defendants in error. Counsel for plaintiff in error confess that they have been unable to find any Texas case on the subject, and, so far as we are advised, it is one of first impression in our State, though there are a number of conflicting authorities in other jurisdictions upon this subject, some of which have been cited by counsel for the respective parties, and will be hereafter noticed. It is true, however, that in the case of Wills v. International & G. N. R. Co., 41 Texas Civ. App., 58, reported also in 92 S. W. Rep., 273, where physicians sued the railway company to recover pay for services rendered to a party who had been seriously injured by one of its trains, necessitating the amputation of his limbs, and where the conductor had employed the plaintiff to render such surgical attention as was necessary and proper, and who did render the same, Chief Justice Fisher delivering the opinion of this court held that the company was not liable; but it must be observed, however, that that was a case in which the injured party was a trespasser and shown to be drunk at the time of the injury. In closing the opinion the court saw proper to use the following language: "We do not undertake to say what would be the power and duty of a conductor of the railway company where a passenger or employe was injured. Here the party injured was a trespasser," thereby leaving the question now before the court open.

It seems to be quite generally held, however, that the authorized agent of a railway company, in the event of an emergency, such as accident or injury to one of its employes while in the line of his duty, would have authority to summon a physician to administer to his necessities, and bind the company to pay therefor. In Elliott on Railways, vol. 1, sec. 222, the author says: "It may be affirmed that the employment of a physician or surgeon is not ordinarily within the scope of the authority of a subordinate agent or employe, but that there may be extraordinary cases giving authority to employ a surgeon or physician. Neither a roadmaster, section agent, yardmaster, nor stationmaster will be presumed to have authority to employ a physician to attend a servant of the company injured in the line of his duties. So, also, it is held that there is nothing in the duties of the company's solicitor, or surgeon, or engineer, or conductor from which such authority can be presumed. But an emergency calling for immediate action in order to save life or prevent suffering may be sufficient to confer authority upon the subordinate to employ necessary surgical aid, if he is the highest representative of the company on the ground. There may be cases of immediate urgency when it will be within the scope of the agent's employment to render those imperative services which the dictates of justice and humanity hold to be due from an employer to a servant injured while engaged in his service, and not only this, but

in cases of urgent emergency it may become his duty to take such measures as will prevent needless suffering and loss of life."

In Clark & Skyles on Agency, p. 160, sec. 62, it is said, speaking with reference to an agent's authority arising in cases of personal injuries by railroad accidents: "The well recognized rule seems to be, although there is some conflict in the authorities, that if an employe or passenger of a railroad company is injured in an accident on such road, and it becomes necessary that the one so injured should have immediate medical or surgical aid the highest official then present or in close communication is constituted an agent by necessity of the railroad company for the purpose of employing such medical or surgical aid as may be necessary for the proper treatment of those injured. The reason for the rule is that by reason of the extreme necessities of the case the law confers upon the highest official present, or in close communication, the authority to employ the required medical or surgical aid."

In one of the leading cases upon this subject, that of Terre Haute & Indianapolis R. Co. v. McMurray, 49 Am. Rep., 752, as shown by the syllabus, it was held by Justice Elliott in an elaborate and well reasoned opinion, that where a railway brakeman is injured in the discharge of his duty at a point distant from the chief office of the company, and stands in need of immediate surgical attendance, the conductor may bind the company by the employment of a surgeon, if there is no superior agent of the company present. Among other things, he says in said case: "We do not doubt that the general rule is that a conductor has no authority to make contracts with surgeons, and if this principle governs all cases the discussion is at an end; but we do not think it does rule every case, for there may be cases so strongly marked as to constitute a class in themselves and one governed by a different rule.

"The authority of an agent is to be determined from the facts of the particular case. Facts may exist which will greatly broaden or greatly lessen an agent's authority. A conductor's authority in the presence of a superior agent may dwindle into insignificance while in the absence of a superior it may become broad and comprehensive. An emergency may arise which will require the corporation to act instantly, and if the conductor is the only agent present, and the emergency is urgent, he must act for the corporation, and if he acts at all his acts are of just as much force as that of the highest officer of the corporation. In this instance (speaking of the case before the court) the conductor was the highest officer on the ground; he was the sole representative of the corporation; he it was upon whom devolved the duty of representing the corporation in matters connected within the general line of his duty in the sudden emergency which arose out of the injury to the fellow servant immediately under his control; either he as the superior agent of the company must in such cases be its representative, or it has none. There are cases where the conductor is the only representative of the corporation that in the emergency it can possibly have. . . . As where the train is distant from the supervision of superior officers, where the conductor must act, and act for the company, and where, from

the time and under the exigencies of the occasion, he is its sole representative, and if he be its only representative he must for the time and exigency be its highest representative." The court then proceeds to give pertinent examples, showing it to be the duty of the conductor to promptly act for the company, upon whom the obligation was imposed of caring for its injured employes.

Again, the court says: "If it be true that there are cases of pressing emergency where the conductor is on the special occasion the highest representative of the company, then it must be true that he may do in the emergency what the chief officer, if present, might do. If the conductor is the only agent who can represent the company, then it is inconceivable that he should for the purposes of the emergency, and during its existence, be other than the highest officer. The position arises with the emergency and ends with it. The authority incident to the position is such and such only as the emergency imperatively creates. . . . Suppose that a locomotive is overturned upon its engineer, and he is in immediate danger of great bodily harm, would it not be competent for the conductor to hire a derrick, or a lifting apparatus, if one were near at hand, to lift the locomotive from the body of the engineer? Surely someone owes a duty to a man, imperiled as an engineer would be in the case supposed, to release him from peril, and is there anyone upon whom this duty can be so justly put as upon his employer? The man must, in the case supposed, have assistance, and do not the plainest principles of justice require that the primary duty of yielding assistance should devolve upon the employer rather than on strangers? *An employer does not stand to his servants as a stranger; he owes them a duty.* The cases all agree that some duty is owing from the master to the servant, but no case that we have been able to find defines the limits of this duty. Granting the existence of this general duty, and no one will deny that such a duty does exist, the inquiry is as to its character and extent. Suppose the axle of a car to break because of a defect, and a brakeman's leg to be mangled by the derailment consequent upon the breaking of the axle, and that he is in imminent danger of bleeding to death unless surgical aid is summoned at once, and suppose the accident to occur at a point where there is no station and when no officer superior to the conductor is present, would not the conductor have authority to call a surgeon? Is there not a duty to the mangled man that someone must discharge? And if there be such a duty, who owes it, the employer or a stranger? Humanity and justice unite in affirming that someone owes him this duty, since to assert the contrary is to affirm that upon no one rests the duty of calling aid that may save life. If we concede the existence of this general duty, then the further search is for the one who in justice owes the duty, and surely where the question comes between the employer and a stranger, the just rule must be that it rests upon the former."

The same judge in concluding this opinion uses this language: "Humanity and justice are, for the most part, inseparable, for all law is for the ultimate benefit of man; the highest purpose the law can accomplish is the good of society and its members; and it

is seldom, indeed, that the law refuses what humanity suggests. Before this broad principle bare pecuniary considerations become as things of little weight. There may be cases in which a denial of the right of the conductor to summon medical assistance to one of his trainmen would result in suffering and death; while on the other hand, the assertion of the right can, at most, never do more than entail upon the corporation pecuniary loss. It may not do even that, for prompt medical assistance may, in many cases, lessen the loss to the company by preventing loss of life or limb."

But some of the authorities, while conceding the law to be as held by Justice Elliott in the case last quoted, insofar as the same may be applicable to railways, yet deny its applicability to other corporations or to private individuals, one of which cases is Godshaw v. Struck & Bro., 58 S. W., 781, where it is held, as shown by the syllabus, that the employment of a surgeon for an injured employe is not within the scope of the duties of a foreman employed by a contractor to superintend workmen engaged in constructing a building, and such employment does not render the master liable for the surgeon's bill.

In Chaplin v. Freeland, 34 N. E., 1007, it is held, as shown by the syllabus, that "the general manager of an ordinary manufacturing business has no authority to bind the owner by the employment of a physician or surgeon to attend an injured employe; in the absence of any evidence showing an absolute necessity for such action by the employer."

A number of cases holding the same view are cited in a full note to the case of The Kenilworth, reported in 4 L. R. A. (N. S.), p. 4, where the last two cases cited are reviewed, amongst others upon this subject, but the author of this note, with force, in our judgment dissents from the view there expressed. We think, however, that there is no sound reason for the distinction that this line of cases seeks to inforce as between railways and other corporations, and we feel that justice and humanity appeal as strongly in favor of the rule as announced by Judge Elliott in the one class of corporations as in the other, and in this view we are supported by Judge Thompson in his Commentaries on the Law of Corporations, vol. 5, sec. 5440, where he says: "An implied power will be ascribed to any corporation employing labor to incur expenses on account of injuries received by its employes in the line of their employment, in the absence of any express statutory grant of such power. This implication rests upon the most obvious grounds of justice and humanity."

In the recent case of Weinsberg v. St. Louis Cordage Co., 116 S. W., 461, in which the defendant was a corporation engaged in the manufacture of rope and twine, this doctrine is fully discussed, and it was there held as to a physician who had been called by the superintendent of the company in the case of an emergency to attend an employe of the company who had been seriously injured in the line of his duty, that the company was liable for the services of said physician. The court says, amongst other things, in passing, that "when a catastrophe occurs in its factory the corporation ought not

to be expected to assemble its board of directors in order to exercise the implied power referred to. There is certainly an emergency power incident to the office of president of such an institution, commensurate with the circumstances now in judgment." Citing a line of cases in support of the doctrine. It is true that in the last case the physician was summoned by the chief executive of the company, but this does not alter the rule, because, as shown by Justice Elliott in the opinion first cited, in the absence of the superintendent or other chief executive officer, the conductor or foreman or other officer actually in charge would have the same authority as would its chief officer to summon aid in the case of an imperative and urgent necessity.

In the case at bar there is no question made as to the reasonableness of the charge of these physicians, but the only point of contention on the party of plaintiff in error seems to be that Barnes, its foreman, did not have the authority to bind the company to pay for the services of said physicians. The facts disclosed that Keasler was a poor man, probably unable to pay for the necessary services of these physicians, of which he was in such urgent need. The main office of the company was in Ft. Worth, a distant city, where its superintendent resided. Prompt action was necessary in order to save the life of the injured man. Barnes, the foreman, was on the ground in charge of the crew of hands, with full authority to employ and discharge them, and do all other necessary things for the conducting of said business at Childress. He responded at once as was his duty when summoned to the injured man, and stated that he would have called physicians himself if this had not already been done. He urged the physicians to do all in their power for Keasler, suggesting that they procure a specialist, if in their judgment it became necessary to do so, and quieted the distressed family with the assurance that he would see that anything that was needed would be paid for. One of the physicians knowing that both Barnes and Keasler were the employes of the building company, and that the former was its foreman, it seems relied upon the conduct of said foreman, and was induced to render the services by reason of what he said and did, and supposed that the company would pay therefor. No greater emergency could have existed than that disclosed by this record for prompt action and attention to the injured man. The duty to render this attention and service was imposed upon someone, and we think, under the circumstances, the company was properly charged with this duty and that Barnes, its only representative at the time, was authorized to do whatever was necessary to alleviate the sufferings of Keasler; and it seems from what was said and done by him that the physicians reasonably believed that he had the authority to employ them and bind the company to pay for their services. The question then arises, did he have this authority? We are inclined to believe that whenever a company employing laborers sends them out under the supervision and control of a foreman, that it clothes him with, at least, the implied authority and power to do, not only such things as may be incident to the work in hand, but all things that might be necessary for the advancement of the mas-

ter's interests. Here the servant was seriously injured in the direct line of his employment. Surely, it was to the master's interest that the servant should have medical attention, to the end that he might be the better enabled to perform the master's service. And, outside of the doctrine of humanity that we have heretofore discussed, we are inclined to the view that our decision in this case can also be rested upon the implied authority, on the part of the foreman, in the absence of the master, to act for him and procure the necessary medical aid for the injured employe, and the foreman in so doing creates a liability against the master for the services of the physicians, for which they are entitled to recover.

The principles of justice and the dictates of humanity, in our judgment, as well as the law, imposed upon the company, under the circumstances disclosed by this record, the duty to furnish the wounded man medical aid, and the foreman acting for it, in the absence of any higher authority, had the implied power to bind the company for the payment of the services of the physicians whom he had employed.

So believing, the judgment of the court below is in all things affirmed.

*Affirmed.*