### RILEY v. GULF, C. & S. F. RY. CO.

(Court of Civil Appeals of Texas. Amarillo. Nov. 1, 1913.)

1. RAILROADS (§ 276*)—INJURIES TO TRESPASSERS—DUTIES TOWARDS TRESPASSER.

A railroad company was under no legal obligation to call in a physician or to care for a trespasser injured while attempting to steal a ride on its freight train.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 878–886; Dec. Dig. § 276.*]

2. NEGLIGENCE (§ 2*) — ELEMENTS — ABSENCE OF DUTY.

Legal responsibility for negligence does not exist in the absence of duty of care; the liability in any case depending on the scope of the correlative duty.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 3, 4; Dec. Dig. § 2.*]

3. MASTER AND SERVANT (§ 302*)—INJURIES TO THIRD PERSON—SCOPE OF EMPLOYMENT.

Where the employés of a railroad company attempted to care for a trespasser injured while attempting to steal a ride, they were acting outside the scope of their employment, and in the absence of express authority the railroad company was not liable for their failure to exercise reasonable judgment or care.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1217–1221, 1225, 1229; Dec. Dig. § 302.*]

Appeal from District Court, Cooke County; Robert H. Hopkins, Judge.

Action by W. J. Riley, as next friend for Oscar Riley, against the Gulf, Colorado & Santa Fé Railway Company. From a judgment on a directed verdict for defendant, plaintiff appeals. Affirmed.

Potter, Culp & Culp, of Gainesville, for appellant. Garnett & Garnett, of Gainesville, and A. H. Culwell and Terry, Cavin & Mills, all of Galveston, for appellee.

HUFF, C. J. For a statement of the appellant's petition and the facts, we accept the statement as made in his brief:

"Plaintiff alleges in his petition: That while his son, Oscar, was trying to board one of defendant's freight trains at Thackerville, Okl., for the purpose of coming to Gainesville, Tex., his foot was mashed and broken. That his said son at once sent for a physician, but that the messenger was wrongfully delayed by the crew in charge of said train, to give information as to the nature and cause of the injury, and for that reason the physician did not reach the said Oscar for some 30 or 40 minutes later than he otherwise would have done. That soon after the injury was inflicted the crew in charge of defendant's train took charge of said Oscar and moved him into the caboose attached to said train where he was when the physician reached there. That the parties in charge of said train were going to take the said Oscar immediately to Gainesville to the hospital and directed the said physician to only give the said Oscar's foot a hurried dressing and try to ease the pain until they could get him to the hospital, where his foot would have proper dressing. But for this direction the physician would have given said foot a thorough and proper dressing. That, after the foot was so hurriedly dressed, the parties in charge of said train removed the said Oscar from the caboose and left him on the platform of the railroad station at Thackerville, while the train proceeded to Gainesville, and the said Oscar was afterwards put upon the north-bound passenger train and carried to his home at Ardmore. That on account of the long delay in getting the physician and on account of the hurried, improper, and insufficient dressing given the foot by the physician acting under the directions of defendant's servants, the foot became so infected before it had proper medical attention, which it did not have until after the arrival at Ardmore, that it became necessary to amputate the same, and on account thereof the said Oscar lost the entire foot.

"Raymond Pyatt testified: That he was with Oscar Riley at Thackerville when he received the injury. That they had boarded one of defendant's trains at Ardmore coming south. When it reached Thackerville they got off and waited until they thought the

train was about ready to start, when they attempted to board the train again. That he saw the said Oscar fall or jump from the train, then he got off. It was dark or about dark. That he went to where the said Oscar was and found him sitting on the ground holding his foot. He told him to go for a physician. He started in a run for a physician in the town of Thackerville. That he was stopped by a railroad man; that is, he had a lantern and a badge. This party began to question him about what the matter was, how the boy got hurt, etc., and where he was going. That he attempted to pass on a time or two but the man detained him, at one time taking him by the hand and pulling him to one side. 'He detained me 30 or 40 minutes.' That when he was permitted to pass he ran on to the town, got a physician, and returned. He found Oscar had been removed into the caboose. The train crew and several other persons were in there. The conductor and others told the doctor to hurry up and dress the foot; that they were going to take him to the hospital in Gainesville. The doctor said the foot should be cleansed and dressed properly, and the conductor told him to dress it hurriedly; that they would take him to Gainesville and dress it properly. The doctor was about five minutes in dressing the foot. While he was dressing it the railroad man kept telling him to hurry. 'After the doctor got through they had some kind of a statement signed by me and Oscar; then they took Oscar out of the caboose. They said they had received a message from the chief dispatcher to send him to Ardmore. The train that the caboose was on, in which Oscar's foot was dressed, went on to Gainesville. It was the same train we were riding on. His foot was still bleeding while he was on the platform. I saw the blood running out of the bandage. Oscar remained on the platform from between 7 o'clock until 11 o'clock.'

"Oscar Riley testified that he is now 18 years of age. 'I remember being hurt at Thackerville in September last year. My foot got caught between the brake and the wheel while I was trying to get on the freight car. When I got my foot loose I jumped off. I then halloed for Raymond Pyatt. When he got to me I was sitting on the ground holding my foot. I told him to go for a doctor as quick as he could, and he started off. I remained on the ground about 15 minutes, when the train crew found me. They put me in the caboose. The caboose was north of where I was lying. They put me on a cushion and laid me down on the floor of the caboose. I do not remember what they said exactly, but they asked me lots of questions. The doctor finally came. When the doctor came the conductor told him to give my foot a temporary dressing right quick, as they would carry me on to Gainesville to the hospital. The doctor said he could save the heel by cutting the foot off right then. The con-

ductor said: "No, go ahead and give it a temporary dressing as quick as you can; we will carry him to the hospital." After my foot was dressed the crew took me to the platform of the depot. They told me they were going to send me to Ardmore on that 12 o'clock train. They said they had wired the train dispatcher and he said to send me to Ardmore on that 12 o'clock train. I never knew I was to be sent to Ardmore until after my foot was dressed. As soon as they put me on the platform this train pulled out going south. The doctor came around to see me twice while I was on the platform. He gave me two hypodermics to relieve my pain but it did not relieve it much. My right foot was cut off, about two days after I got home, about four inches below the knee.'

"Dr. Cox testified: That he resides at Ardmore. That he is a physician and surgeon. That he was at the train with Oscar's father the night Oscar was brought up from Thackerville on the train. Saw him in the baggage car. He was resting on some cushions about middle way of the car. His foot had been bleeding so much that the blood ran to the door. 'I examined the wound after we got him to the house. I found it mashed and lacerated and the bones crushed. It was in bad condition. It was just dressed with a bandage, just wrapped up. It did not seem to have been cleansed. I found dirt, coal dust, and things like that in it. It is always better for an injury of this sort to be dressed quick. The sooner it is dressed the better. It would have been better if this foot could have been dressed 30 or 40 minutes after the injury. Leaving it exposed for several hours with the cinders in it would cause the wound to have less resistance and less power to throw off anything that might set in. Dr. Booth and I thought when we dressed it that there was some chance to save the foot, but the probabilities of saving it at that time were not so good as they would have been had the foot been dressed 30 or 40 minutes after the accident. In dressing the wound we cleansed it out and took out all the coal dust and removed the shattered bones we could find and drew the parts together.'"

It is admitted that the son of appellant was a trespasser on appellee's train at the time of his injury and that his injury was not caused by the negligence of appellee or its employés. After the introduction of this evidence, the appellee moved the court to instruct a verdict for it. The court sustained the motion and instructed the jury to return a verdict for the defendant, the appellee herein, which action of the court is assigned as error in this court.

Appellant presents thereunder the following proposition: "The defendant's servants in charge of its train, having undertaken to care for the minor, Oscar Riley, after his injury had been received, were required by

the law to use reasonable care in doing so, though he was a trespasser at the time he received the injury and their failure to use such care renders the appellee liable for damages for such failure."

[1] The son of appellant was injured while trespassing and in attempting to steal a ride on the freight train of appellee. Under the facts, appellee was under no legal obligation to call in a physician . or to care for him while injured. Wills v. I. & G. N. R. R. Co., 41 Tex. Civ. App. 58, 92 S. W. 273.

[2] Legal responsibility for negligence does not exist in the absence of duty of care, and, upon the scope of the correlative duty in any case, the question of the liability for negligence depends.

[3] If there was no legal duty imposed upon the appellee to care for the son of appellant, the employés of appellee could not, without authority from their employer, assume such care, and, if they failed to exercise reasonable judgment or care, this would not create a liability against appellee for injuries sustained by reason thereof. A railway company is under no legal obligation to furnish care for an injured employé inflicted while engaged in his duties for the company. This is held by several courts and by our own. It has been held in cases of emergency demanding immediate attention that the conductor or other subordinates may, in the absence of some higher authority, act for the company in securing medical aid or assisttance and thereby create a legal liability against the company. But we believe it will be found in all cases so holding that liability rests on the ground that "an employer does not stand to his servants as a stranger; he owes them a duty." Terre Haute & Indianapolis R. R. Co. v. McMurray, 98 Ind. 358, 49 Am. Rep. 752; Texas Building Co. v. Albert et al., 57 Tex. Civ. App. 638, 123 S. W. 716. In cases of the class mentioned, the liability is declared because of emergency, and the authority of the conductor or other subordinate is implied.

We cannot assent to appellant's proposition. Admitting that, if the appellee had taken charge of the boy and undertook to care for him, we think the evidence fails to show that appellee so took charge of him. The fact that the train crew did so does not establish that they were acting for the railroad. The conductor or the train crew had no authority to bind the company for their negligent acts while acting outside of the scope of their employment, unless express authority is given or is necessarily implied. It is well settled that there is no duty resting on appellee to care for the boy who was a trespasser and who was injured through no fault of the appellee. Wills v. I. & G. N. R. R. Co., supra. When the employés in this case assisted the boy, they did so from no legal obligation imposed on the company but evidently did so from a humane or moral duty. It was outside the scope of their employment and was therefore a personal act, and in performing that act the company is not liable if the servants failed to use reasonable judgment or care in affording necessary medical assistance. Adams v. Southern Ry. Co., 125 N. C. 565, 34 S. E. 642. "It is a general rule that a railroad company not negligent in injuring a trespasser cannot be made liable on the ground that its servants were negligent in caring for him after the accident. The railroad company is under no legal obligation to take charge of the wounded man, however strong a moral obligation may be." Elliott on Railroads, vol. 3 (2d Ed.) § 1265i.

The appellant relies on the case of Railway Co. v. State, 29 Md. 420, 96 Am. Dec. 545. Text-writers and the courts, in discussing that case, approve it upon the ground that there was evidence of negligence on the part of the railroad in striking a man at a highway crossing. This being so, the duty of taking care of the man afterwards resulted from the legal wrong done. Griswold v. Boston & M. R. R. Co., 183 Mass. 434, 67 N. E. 354; Union Pacific v. Cappier, 66 Kan. 649, 72 Pac. 281, 69 L. R. A. 513; Elliott on Railroads, supra.

If a railroad is to be made liable for the negligent act of its employés in caring for an injured trespasser, when in the first instance the company is not legally liable, it would discourage humane or generous acts on the part of employés. "It is a doctrine which would allow an action against a good Samaritan and let a priest and a Levite go free." Griswold v. Boston & M. R. R. Co., supra.

We think the trial court properly sustained the motion to instruct a verdict for the appellee. The judgment is affirmed.