PRODUCERS' OIL CO. v. GREEN.
(No. 7753.)

(Court of Civil Appeals of Texas. Galveston.
June 23, 1919.)

1. CORPORATIONS ⬩432(12)—AUTHORITY OF
EMPLOYÉ — EMPLOYMENT OF PHYSICIAN —
SUFFICIENCY OF EVIDENCE.

In physician's action against corporation for
professional services rendered employé of the
corporation, evidence *held* insufficient to sustain
finding that employé who had made arrange-
ments for the rendition of such services had au-
thority to bind the corporation.

2. CORPORATIONS ⬩407(1) — AUTHORITY OF
EMPLOYÉ—MEDICAL SERVICES.

A private corporation with limited power of
operating, drilling for, and producing oil was not
liable for medical services rendered its employé
upon request of another employé having no au-
thority to bind the corporation.

3. CORPORATIONS ⬩429, 432(1)—AUTHORITY
OF AGENTS—NOTICE OF AUTHORITY—BURDEN
OF PROOF.

Corporations can be bound by their agents
only when acting within the scope of their au-
thority, and those dealing with such agents are
not only chargeable with notice of but in case of
controversy have the burden of showing author-
ity assumed to have been in fact possessed.

4. MASTER AND SERVANT ⬩351—WORKMEN'S
COMPENSATION — INJURIES TO EMPLOYÉ —
PHYSICIAN'S SERVICES.

Corporation was not liable for medical serv-
ices rendered an employé in absence of special
authority from board of directors, where corpo-
ration had provided method of caring for inju-
ries to employés by means of insurance it had
taken out for their benefit under the Workmen's
Compensation Act (Vernon's Sayles' Ann. Civ.
St. 1914, arts. 5246h–5246zzzz).

Appeal from Harris County Court, at Law;
Roy F. Campbell, Judge.

Action by Dr. C. C. Green against the
Producers' Oil Company. Judgment for
plaintiff, and defendant appeals. Reversed
and rendered.

Woods, King & John, of Houston, for appel-
lant.

Campbell, Myer, Myer & Freeman and
Sewall Myer, all of Houston, for appellee.

GRAVES, J. Dr. Green brought this suit
against the Producers' Oil Company a corpo-
ration, and W. J. Sherman, an individual, to
recover the reasonable value of his profes-
sional services in having performed a surgical
operation upon R. R. Earp, one of the Oil
Company's employés, who had been injured
while in its service. He sought judgment
against Sherman individually only in event
the corporation was not held, thus alleging
the basis of its liability:

"That on or about the 25th day of February,
1916, the said W. J. Sherman, being then and

there the duly authorized agent of his code-
fendant, Producers' Oil Company, requested this
plaintiff to perform an operation upon one R. R.
Earp, an employé of Producers' Oil Company,
who had been injured during his employment
with said company. Acting upon this request,
plaintiff did in fact perform said operation,
known as sature of the patella. Said operation
was performed with care and skill, and was,
from both a medical and practical standpoint,
successful. That before performing the opera-
tion plaintiff was assured by the defendant, act-
ing through its authorized agent as aforesaid,
that said Producers' Oil Company would pay
to the plaintiff his fees for performing said op-
eration, though no express contract as to the
amount of the charge was made."

Over the protest of the Oil Company the
cause was submitted on special issues to a
jury, who found that W. J. Sherman, before
the service was rendered, requested Dr.
Green to perform the operation upon Earp
under statement that the company would pay
him for it, and that Sherman was authorized
by the Oil Company to make such request
and statement.

No issues being raised as to the rendition
of the service nor as to the reasonableness of
the amount claimed therefor, pursuant to
this verdict the court entered judgment in
Dr. Green's favor against the corporation
alone for $150, permitting Sherman to go
hence with his costs.

The Oil Company appeals contending
through a number of assignments that it was
not liable, and that its request for a peremp-
tory instruction embodying that view of the
law should have been given below.

We think the position well taken. The un-
disputed testimony showed that Sherman
was merely a stenographer and clerk in the
office of the general superintendent for the
South Texas division of the business, C. P.
Clayton, the latter being a general officer of
the company and head of the department in
which Sherman worked, the actual operation
of the corporation's business being divided
into departments, each having a head; that
at the time Sherman made the request of
statement to Dr. Green found by the jury
the Producers' Oil Company was a subscriber
to the Workmen's Compensation Act (Acts
33d Leg. c. 179 [Vernon's Sayles' Ann. Civ.
St. 1914, arts. 5246h–5246zzzz]), and had pro-
vided for the insurance of all its employés
thereunder, which facts were then communi-
cated to Dr. Green; and that, aside from
such authority as legally might and actually
did come to him from his superior officer,
Mr. Clayton, Sherman had none whatever to
bind the company to pay for medical serv-
ices rendered to Earp; indeed, Dr. Green
himself excludes any other source by the
specific declaration of his cause of action
already quoted, and by his testimony here-
inafter referred to.

Beyond the uncontroverted features stated,

---

(212 S.W.)

there may at first blush appear to be some haziness in the evidence as to what authority was, or more accurately speaking, perhaps, was attempted to be, conferred on Sherman by Clayton, but it is thought a careful reading of the record as a whole will dispel it.

Sherman first testified by deposition, the material portion of his evidence there given being this:

"I was in the head office. I was not one of the department heads. * * * I was connected with the general superintendent's office. I was a stenographer and clerk in the office. I handled the accident report in the claim or injury of Mr. R. R. Earp, an employé of the Producers' Oil Company. The Humble office turned that over to me. The superintendent at Humble mailed it into the office and I got it when it reached the office. Part of my duties was opening the mail and attending to matters of this kind. Nobody gave me authority to attend to matters of this kind. * * * It was part of the duties of the office. One of the duties of the desk I was on was attending to matters of this kind. That was one of the duties of the desk that I occupied on or about February 25, 1916. It was one of the duties I performed under C. P. Clayton, general superintendent, and was turned over to me by him to handle.

"I am the same W. J. Sherman who phoned to Dr. Charles C. Green about this matter. * * * Mr. Clayton told me to phone to Dr. Green about this matter. He was the head of that department at that time. I reported back to Mr. Clayton that I had phoned to Dr. Green.

"The actual running of the business of the Producers' Oil Company was divided into departments, each with a department head. Mr. Clayton was the general superintendent of this division of the Producers' Oil Company, and he occupied that position on the 25th day of February, 1916.

"I kept Mr. Clayton informed as to what was being done and the progress being made by me in the Earp matter, and the Earp matter was being handled by me under the supervision and control of Mr. Clayton."

Upon the trial he was again a witness, orally reiterating that he was only a stenographer and clerk in the general superintendent's office, and as such merely under the duty of handling and making out the accident report in such instances as this, explaining in detail that his former apparently unqualified statements in the deposition were not meant to go further and to imply that Mr. Clayton had placed him in general charge of Earp's case. These material excerpts will sufficiently indicate the purport of his explanations:

"Neither Mr. Clayton or any other general officer of the company authorized me to arrange to have this man operated on. I have stated in my direct examination that it was my duty to handle the accident report. It was not a part of my duty, and I did not have authority from any general officer of the company, or any one else over there, to arrange for medical services for this employé or any other employé. My duty with reference to that was merely to collect the accident reports off of the people and send them in to the insurance company. * * * I testified on direct examination by deposition, in answer to the question as to what connection I had with the claim or injury of R. R. Earp, that I handled the accident report. * * * I referred to handling the accident reports. That would not have any connection whatever with employing physicians to render medical service or any other service to an injured employé. He asked me this question, 'It was one of the duties you performed under C. P. Clayton, general superintendent, and was turned over to you by him to handle?' To which I answered, 'Yes.' The duties I referred to there were the handling of the accident report. Mr. Clayton instructed me to call Dr. Green to ascertain if the man could be removed from the St. Joseph's infirmary to the Baptist Sanitarium. He didn't say anything to me about arranging with any one for payment of medical services rendered to that man. * * * Neither Mr. Clayton or any other head of the departments had authorized me to arrange for medical services for any of its employés.

"He asked me, 'Did you report back to Mr. Clayton that you had phoned Dr. Green?' and I answered, 'Yes, sir.' I told Mr. Clayton that Dr. Green had told me that, as he was a director out at the infirmary, he would explain to the Sisters and that he knew that it would be all right, and that they would look to the insurance company for their money.

"He asks me here, 'Did you keep Mr. Clayton informed as to what was being done and the progress that was being made in this matter?' To which I answered, 'Yes.' I told Mr. Clayton that Dr. Green said that he would arrange with the sanitarium, and that was the end of it. I never made any report to him, that for the injured man to be put there. I had to promise Dr. Green that the Producers' Oil Company would pay this bill. * * * I stated here, in answer to this question, 'And the Earp matter was being handled by you under the supervision and control of Mr. Clayton?' 'Yes, sir.' That was the accident report on Mr. Earp—merely the accident report—that I mean in answer to that question."

"These reports were made on blanks like the one showed me by counsel. I had not any other duty with reference to the handling of these matters other than the handling of these reports. There is nothing in this report showing that it is part of my duties to arrange for medical services. I testified that the extent of my duties was getting the necessary information, filling out these blanks, and sending one to Austin and one to Dallas; one to the Industrial Accident Board at Austin, and one to the Texas Employers' Insurance Company, whose head office is at Dallas."

It cannot be said that Dr. Green contradicted, or even attempted to weaken, any of this evidence; rather did his own proof tend to confirm it. In accurate accord with his pleading above quoted from, he testified that the only arrangement he had about the company's paying his fee was made over the telephone with W. J. Sherman, this being his version of what transpired:

"I had a conversation about this matter over the telephone with Mr. Jutney W. Sherman, of the Producers' Oil Company. He called me. When he called me on the phone he asked me if I was treating Mr. Earp at the infirmary, and I told him I was. He then asked me was the injury a serious one, and what would be necessary to be done. He says, 'The reason I am asking you, he is one of the Producers' Oil Company men.' He said, 'The Sisters will not take him because they have had some trouble with the insurance company; they felt that he might be put there for a week and then there would be no way of getting their money.' I said, 'I am on the staff, and I will go out there, and if there is any way I can fix it I will let you know.' I told him it would be twenty-four or forty-eight hours before I operated on him, to give the oozing from the bone time to stop.

"Anyhow, after that, I called him up afterwards, and told him that I had had the following conversation with the Sisters. * * * And before that I asked him, I says, 'What part will you be responsible for?' And he says, 'We will be responsible for all expenses during the first week.' Then I said, 'My operation will be within twenty-four or forty-eight hours, and will come in the first week, and that, of course, will come in the list of expenses.' He said, 'Yes.' I says, 'Well, then, as I understand it, Earp will not have to be responsible for any of the expenses except after the first week and the first week you will pay it.' He says, 'Yes.'

"I then made the arrangements, with the understanding with Mr. Earp that the Producers' Oil Company would pay the first week's expenses, including my operation, and after that he would have to pay the expenses, as there would not be any expense of mine except for the operation. * * * Then I went on and operated, and afterward I went to W. J. Sherman, and gave him a report of the amount and about how long the man would be in the hospital."

"I understood at that time that the Producers' Oil Company did have their employés insured under the Workmen's Compensation Act. * * * I made no effort to find out from the officers of the Producers' Oil Company who Mr. Sherman was. I did not ring up any officer of the Producers' Oil Company. I made no inquiry of any of them as to what Mr. Sherman's authority in the premises was. Sherman called me up; he did not promise to pay me this bill in person. I relied on the Producers' Oil Company. I relied on Mr. Sherman's word that the Producers' Oil Company would pay my bill."

[1, 2] With the entire body of the evidence in this condition, we conclude that the jury's finding that Sherman was authorized by the Oil Company to make the arrangement they found he did with Dr. Green had no support. As will be noted, it was not even shown that his chief, Mr. Clayton, the company's divisional superintendent, had any knowledge of it; he himself was only a stenographer and clerk in that official's department; and private corporations with the limited charter powers of operating, drilling for, and producing oil, as this one was shown to be, may not become bound upon the mere ipse dixit of such an underling for medical services, rendered, or to be rendered, under the circumstances here presented, to another of its employés.

[3] Corporations can be bound by their agents only when acting within the scope of their authority, and those dealing with such agents are not only chargeable with notice of, but, in case of controversy, have the burden of showing, the authority assumed to have been in fact possessed. El Fresnal Irrigated Land Co. v. Bank of Washington, 182 S. W. 701; Rishworth v. Moss, 191 S. W. 843; Wills v. Ry. Co., 41 Tex. Civ. App. 58, 92 S. W. 273; Godshaw v. Struck & Bro., 109 Ky. 285, 58 S. W. 781, 51 L. R. A. 668; Cleburne Street Railway Co. v. Barber, 180 S. W. 1176; Ry. Co. v. Hoover, 53 Ark. 377, 13 S. W. 1092; Texas Building Co. v. Doctors Albert and Edgar, 57 Tex. Civ. App. 638, 123 S. W. 717; Overton v. First Texas Insurance Co., 189 S. W. 514.

Manifestly no such burden was met in this case. Apart from Sherman's deposition, there is nothing even tending to connect Mr. Clayton with the transaction; and a fair construction of what Sherman there meant, in the light of his oral explanations at the trial, is that Mr. Clayton only turned over to him the matter of attending to the accident report in Earp's case, and not the management of it generally, with authority to do whatever Clayton himself could have done in the premises.

[4] But even if it were otherwise, and it had been shown that Clayton both knew all Dr. Green says occurred between himself and Sherman, and had delegated to the latter every power he himself possessed for the corporation, a majority of the court are of opinion that it would still not have been bound; this for the reason that the company had previously provided a method of caring for such contingencies by means of the insurance it had taken out for the benefit of its employés under the Compensation Act, and not even one of its general officers could substitute a different provision, or impose a liability on account of services rendered an employé, particularly in the absence of special authority from the board of directors. The minority member, however, thinks that in this contingency the facts of the case would have brought it within the operation of the principle applied in instances of emergency, and so have rendered the corporation liable for its general superintendent's acts. Texas B. Co. v. Albert, 57 Tex. Civ. App. 638, 123 S. W. 716; Perkins v. Kilpatrick (App.) 193 S. W. 876; Gray v. Lumpkin, 159 S. W. 880. At any rate, since all are agreed that no such proof was made, this divergence of view becomes immaterial and need not be enlarged upon.

The facts appearing to have been fully developed under the conclusions reached, it

becomes the duty of this court to sustain so much of the various assignments of error presented as raise the question herein discussed, to reverse the judgment of the lower court, and to here render judgment for the appellant; that order has accordingly been entered.

Reversed and rendered.

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes