## O. C. WHITAKER CO. v. HALL.

No. 5604.

Court of Civil Appeals of Texas. Amarillo.

March 27, 1944.

Rehearing Denied May 1, 1944.

Kemper, Hicks & Cramer, of Houston, for appellant.

Orgain, Carroll & Bell and Lamar Cecil, all of Beaumont, for appellee.

STOKES, Justice.

This is a common law action for damages for personal injuries instituted by the appellee, Hartman Hall, against the appellant, O. C. Whitaker Company, a corporation. The record reveals that on December 17, 1940, appellee, who lived at Winnie in Chambers County, borrowed the automobile of a friend, in which to go to Beaumont to consult a dentist. After transacting his business at Beaumont and while upon the highway returning home, shortly after noon, the automobile in which he was riding became involved in a collision with a pickup truck coming from the opposite direction, belonging to and being operated in a negligent manner by Roy Grimes. Alfred Jones and T. B. Gary, two employes of appellant, were riding with Grimes in his truck. Appellee was severely injured in the collision and he sought to hold appellant responsible for his injuries by virtue of an alleged arrangement between the employes of appellant and Grimes for Grimes to transport Jones and Gary from where they were working, near Fannett, to Beaumont. Under a contract with the United Gas Company, appellant was engaged in laying a pipe line near Fannett where it had a large number of laborers, divided into several crews. The crew in which Jones and Gary were working, having finished for the day, were ready to be transported back to Beaumont upon trucks belonging to, or engaged by, appellant, and appellee alleged that because of the lack of sufficient facilities on the trucks owned and operated by appellant, an arrangement was made with Grimes by B. W. Melton, one of the laborers, which was acquiesced in by Merrill Tatum, foreman of the crew in which Jones and Gary were working, to transport Jones and Gary in his truck and that Grimes was, therefore, an agent and employe of the appellant.

The case was submitted to a jury upon special issues, in answer to which the jury found that Melton made the arrangement with Grimes; that Merrill Tatum, the foreman, heard the agreement and acquiesced in it; that in making the agreement Melton acted with implied authority from appellant; and that Grimes was transporting the employes to Beaumont in furtherance of the business of appellant. They further found that an emergency existed in reference to transporting the employes; that Grimes was an emergency servant of the appellant in so doing; that Grimes was operating his truck on the left-hand side of the road, which constituted negligence and a proximate cause of the injuries to appellee; that Grimes was driving at a negligent rate of speed and failed to keep a proper lookout, both of which consti-

tuted negligence, and that each was a proximate cause of the injuries to appellee; and that the amount which would fairly and reasonably compensate appellee for the injuries sustained by him was $45,750.

Based upon the verdict of the jury, the court rendered judgment in favor of appellee for the amount indicated and, appellant's motion for a new trial being overruled, it perfected an appeal to the Court of Civil Appeals of the Ninth Supreme Judicial District, at Beaumont. Upon an order equalizing the dockets of the Courts of Civil Appeals, the Supreme Court has transferred the case to this court and it is now before us for review.

At the close of the testimony, appellant presented and urged a motion for an instructed verdict, which was overruled. After the verdict was returned, it presented and urged a motion for a judgment non obstante veredicto, which was likewise overruled, and the first two assignments of error urged by appellant pertain to the action of the court in overruling these motions. Two questions are presented under them which we think must control our disposition of the case. They are, first, that Grimes was not the agent or employe of appellant at the time of the collision because, even admitting he had been requested by Melton in the presence and hearing of Merrill Tatum to transport Jones and Gary to Beaumont and that Merrill Tatum heard and acquiesced in the arrangement, neither Melton nor Tatum had authority from appellant, either express or implied, to make or acquiesce in such employment and bind appellant thereby; secondly, that, even if they had had such authority, no emergency existed which would authorize Melton or Merrill Tatum to employ Grimes to transport Jones and Gary to Beaumont under the rule of emergency employes.

The uncontradicted testimony shows that Henry Tatum was the superintendent of the entire construction job and had been employed in that capacity by appellant for a number of years. In constructing the pipe line, it was necessary to have several different crews of laborers, one to dig the ditch, another to lay the pipe line, and a third crew, known as the "priming" crew, working with a priming machine by which they applied to the pipe a primer coat consisting of a substance necessary to be applied before the final coat of an asphalt or tar-like substance was applied. It was necessary that the primer coat have from one to three hours in which to dry before the next crew worked upon it, and that crew then took charge of it and with another machine, called the "doping" machine, they applied the asphalt substance and wrapped the pipe with heavy paper. Following this last-mentioned crew was another crew called the "Holiday gang," consisting of five men who worked with a machine called a "Holiday Detector," by which they discovered and filled spots or spaces on the pipe that had been missed or overlooked by the "doping gang." Merrill Tatum, a son of Henry Tatum, was an experienced laborer in the work of laying pipe lines and was employed on this job, as well as others at other times, by his father as foreman of the "doping" crew, which included the "Holiday gang," his duties being to oversee the work being performed by his crew and he was responsible for the efficiency of the work his crew performed. He had authority to employ and discharge laborers who worked in his crew, one of the members of which was B. W. Melton. The evidence shows that Melton had had considerable experience in laying pipe lines, both for appellant and other like concerns, and was especially efficient in the operation of a Holiday detector. He usually operated the machine and instructed other members of that crew as to how the work should be performed when it appeared they were not familiar with it. He was known as a "lead-off" man, who usually directed the remainder of the crew in the absence of the foreman. Appellant maintained a warehouse and headquarters in Beaumont where all of its laborers gathered each morning and from which they were conveyed on trucks to the place where the work was being done. Their wages did not begin until they reached the place where the pipe line was being constructed but they were paid for the time consumed in returning to the warehouse. There was evidence to the effect that the "doping" machine broke down about noon, December 17, 1940, and it became necessary to place it upon the truck being used by the "doping gang," and return it to the warehouse for repairs. This made it necessary for the entire crew, including the "Holiday gang," to cease work for the remainder of the day because the "Holiday gang" could not proceed ahead of the "doping" machine, and all

of the "doping" crew, including the five men in the "Holiday gang," were instructed to return to the warehouse in Beaumont. Roy Grimes had been employed by appellant up to December 12, 1940, at which time he quit work and was finally paid off. He intended shortly to go to his home in Henrietta to spend the holidays and, not being engaged in any sort of work, he decided to visit some of his friends who were working on the pipe line. He drove out there in his pickup truck on the morning of December seventeenth, where he remained until the crew of laborers ceased work. According to Jones' and Gary's testimony, there was not enough room on the truck for them to ride back to Beaumont and Melton arranged with Grimes to return them in his pickup truck. It was undisputed that Henry Tatum, the superintendent, did not hear the conversation between Melton and Grimes, but it was shown that Merrill Tatum was there and could have heard it. Gary and Jones boarded Grimes' pickup truck and they left the scene of the work with Grimes ahead of the company truck. It was on their trip to Beaumont that the collision occurred.

Upon the theory that Grimes was the agent or employe of appellant by virtue of the agreement between him and Melton, heard and acquiesced in by Merrill Tatum, the court submitted the case to the jury upon the question of Grimes' negligence in causing the collision, and appellant's first contention is that the court erred in refusing to give to the jury a peremptory instruction because, under the facts proved, Grimes was not the agent or employe of appellant and appellant was, therefore, in nowise responsible for his acts.

 It was undisputed that Henry Tatum was somewhere on the ground and was available at the time the laborers ceased work and started to Beaumont. According to the uncontroverted testimony, he was the only one who had ever employed trucks for transportation of the crews. His testimony was undisputed that he had never delegated that authority to Merrill Tatum or anyone else, but had at all times personally directed the transportation of the laborers to and from the work. The testimony wholly failed to reveal any authority on the part of either Merrill Tatum or B. W. Melton to make the alleged contract with Grimes in behalf of appellant to transport Jones and Gary back to Beaumont. Merrill Tatum's duties were confined to directing his crew concerning the work being performed by them and to employing and discharging laborers who worked in his crew. Beyond that he had no authority whatever and no witness testified to any circumstance or occasion upon which he had theretofore exercised any additional authority. Melton was nothing more than a laborer in Merrill Tatum's crew. Although he was an experienced laborer and knew more than the ordinary employe about operating the Holiday machine and frequently directed the others in its operation, he was clothed with no authority over anyone else and certainly had no authority to bind appellant to the alleged · contract with Grimes. It is not claimed, and no witness testified, that any other person had any connection whatever with the agreement and, in our opinion, appellant was not bound by it. The law is well established and is elementary that where there is neither express nor implied authority extended to a servant to employ another to assist in the performance of the work of his master, the relation of master and servant does not exist between the one so employed and the master, and the latter is not liable for the negligence of the one so employed under the doctrine of respondeat superior. Worsham-Buick Co. v. Isaacs, 126 Tex. 546, 87 S.W.2d 252; Haluptzok v. Great Northern Ry. Co., 55 Minn. 446, 57 N.W. 144, 26 L.R.A. 739; Taylor v. Baltimore & O. R. Co., 108 Va. 817, 62 S.E. 798; Vorbeck v. Patten-Davies Lumber Co., 67 Cal. App. 475, 227 P. 929; Producers' Oil Co. v. Green, Tex.Civ.App., 212 S.W. 68. It is not claimed by appellee that any express authority was given to either Merrill Tatum or Melton to effect the employment of Grimes, but he insists that they had implied authority because Merrill Tatum was foreman of one of the crews working on the construction job and had authority to employ and discharge members of his crew. It is true that he possessed such authority but it does not follow that he had authority to go beyond that which had been extended to him and perform duties which in no sense pertained to his jurisdiction. As we have said, the matter of arranging for the transportation of the laborers rested solely in Henry Tatum and no witness testified that Henry Tatum had anything whatever to do with the employ-

ment of Grimes or knew anything about it. Although he may not have been on the immediate grounds, according to all of the witnesses he could not have been far away and the testimony leaves no doubt that he was available.

In the case of Worsham-Buick Co. v. Isaacs, supra, Cohn, the sales manager of the company, permitted Simpson, the service superintendent, to take from the sales room of the company a new automobile on Saturday afternoon to be used by him the following day. In the afternoon of the next day, while Simpson was driving the new car, it collided with an automobile in which R. W. Isaacs was riding. The collision was the result of negligence on the part of Simpson and Isaacs having died from injuries received in the collision, his surviving wife and daughter instituted the suit against Worsham-Buick Co., seeking to hold it liable upon the theory that Simpson was its agent by virtue of the agreement entered into the preceding day between him and Cohn and under which Cohn permitted Simpson to use the car. In passing upon this contention, the Supreme Court said [126 Tex. 546, 87 S.W.2d 253]:

"There is no evidence that Cohn, as sales manager, had any authority, express or implied, to loan automobiles to anyone for a use not connected with the business of his principal. Cohn's employment was for the purpose of selling automobiles, and the loaning of them to his friends for their personal use was not within its scope. In loaning the automobile to Simpson, Cohn was not acting for his principal, Worsham-Buick Company, but was doing an act unauthorized by it. In short, Worsham-Buick Company did not loan the automobile to Simpson, negligently or otherwise. It could not, therefore, be held liable for the injuries sustained by defendants in error on the theory that it did negligently loan it to him."

In the case of Vorbeck v. Patten-Davies Lumber Co., supra, Baldwin was an employe of the lumber company, his duties consisting of loading trucks in the yard. On Saturday afternoon all of the employes except Baldwin ceased their work and left the lumber yard. The company had sold some lumber to a customer who desired to use it the following day in the construction of a building. A friend of Baldwin, one Isherwood, who worked in a bakery across the street, went over to the lumber yard and, upon being told by Baldwin that he would like to deliver the lumber to the customer, Isherwood volunteered to drive the loaded truck and deliver the lumber, to which Baldwin consented. After delivering the lumber and while returning to the lumber yard, the truck being driven by Isherwood struck and injured the plaintiff, who filed suit against the lumber company. In passing upon the question of the lumber company's liability, the Court said [67 Cal.App. 475, 227 P. 931]:

"The positive evidence in the case at bar is all to the effect that Baldwin was not authorized to move the trucks when loaded, nor to employ the services of others for that purpose; and it therefore necessarily follows that he had no implied authority to employ another to do work which he was not employed to do, and for the doing of which he was in no way responsible."

■ The implied authority in Merrill Tatum and Melton, contended for by appellee, could arise only from the nature of the work being performed and the course of conducting the business of the appellant a sufficient length of time that its knowledge and consent might be inferred. Neither of those elements is present in the testimony. The nature of the work being performed, although including the transportation of the laborers, could not form the basis of such implication, because Henry Tatum, who was possessed of supreme authority in the matter of transportation, retained for himself all the authority pertaining to the transportation of employes, and there is nothing in the testimony to indicate that the business or operations of the appellant had ever been conducted in such a manner as to warrant the implication of authority on the part of either Merrill Tatum or Melton in the matter of transporting the laborers to and from their work. As far as the record shows, neither of them ever had anything to do with arranging for such transportation, and it necessarily follows that they had no such implied authority. They could not, therefore, bind appellant to any sort of contract with Grimes under which he was engaged to transport Jones and Gary back to the warehouse in Beaumont.

■ The second contention of appellant is that, even if Melton and Merrill Tatum

had been clothed with the authority contended for by appellee, no emergency existed that would authorize either of them to employ Grimes to transport the two employes to Beaumont under the emergency employment doctrine. Appellee strenuously contends that if Merrill Tatum and Melton were not impliedly authorized by the circumstances we have discussed to make the contract with Grimes, then an emergency existed, to relieve which they were legally authorized to employ Grimes for the purpose stated. The alleged emergency consisted of the following conditions which are shown by the evidence: All of the employes were transported each morning from the warehouse in Beaumont to the work and returned to the warehouse in Beaumont when the day's work was finished. The distance was about twenty miles and the place where they were working was in the country, where no hotel or lodging place was available. The weather was damp and cold, the temperature ranging from thirty-four to thirty-eight degrees. Although appellant owned a number of trucks and was using them in the construction work, only one of them was at the particular place where the "doping" crew was working, the others being located at different places on the line, which extended several miles. There were no taxicabs, busses, or any other means of public conveyance from the construction job to Beaumont, and it was necessary that all of the employes be returned to their homes before nightfall. Appellee asserts that if they had not been returned to their homes, their health would have been endangered and that an emergency therefore existed.

■ It has been held in many cases that in an emergency which demands immediate attention and which renders it necessary in his employer's interest that an employe have temporary assistance, he is deemed in law to have implied authority to procure necessary help and thus create between the employer and the emergency assistant the relationship of master and servant which will charge the employer with responsibility for injuries to, or negligence of, the employed assistant. We cannot agree with appellee, however, that such an emergency as is contemplated by the law was shown in this case. The employes ceased their work about noon. The undisputed testimony showed that Henry

Tatum had always been diligent in seeing that all of the employes were transported back to Beaumont when the day's work was finished, and at no time had a single employe been overlooked and left without means of transportation on the trucks. It was further shown, without dispute, that Henry Tatum himself had with him a pickup truck in which Jones and Gary could have returned to Beaumont if there was not room on any of the trucks. A full half day was left in which Henry Tatum could, no doubt, have arranged for the transportation. The emergency rule is never applied by the courts as a means of relative convenience. It consists of a sudden and unexpected incident, to remedy which the employing servant, plus the aid of the regularly employed assistants at hand, if any, can not perform. The occasion must be one which renders it absolutely necessary to obtain assistance and without which the emergency conditions cannot be overcome by the servant or any of the co-employes in the regular service of the master. It is obvious that no such conditions existed in the matters here involved and, therefore, there was no emergency.

■ Moreover, to warrant a servant in assuming the responsibility of employing assistants, the employing servant must be engaged at something that is within the scope of his own employment. The rule does not apply if the servant who requests assistance is engaged at something beyond the scope of his employment. Standard Oil Co. v. Adams, 271 Ky. 221, 111 S.W.2d 668; Kentucky Lumber Co. v. Nicholson, 157 Ky. 812, 164 S.W. 84, 51 L.R.A.,N.S., 1213; Riley v. Gulf, C. & S. F. Ry. Co., Tex.Civ.App., 160 S.W. 595; Gray v. Lumpkin & Thomas, Tex.Civ.App., 159 S.W. 880; Texas Bldg. Co. v. Drs. Albert & Edgar, 57 Tex.Civ.App. 638, 123 S.W. 716; Lancaster v. Futrell, Tex.Civ.App., 218 S.W. 805; Moss v. Rishworth, Tex. Com.App., 222 S.W. 225.

In the case of Kentucky Lumber Co. v. Nicholson, supra, the plaintiff Nicholson happened to be in or near the grounds of a sawmill and manufacturing plant belonging to the lumber company and located near a railroad from the main line of which a spur track extended into the grounds of the lumber company. The lumber company's foreman, Bradley, directed Nicholson to loosen a latch in the switch at-

tached to the spur track upon which a car had become fastened. In doing so, Nicholson was injured and he brought suit to recover damages for the injury. The emergency doctrine was invoked and, in denying its application, the Court observed that Bradley's duties as foreman of the planing mill did not require him to exercise any supervision or control over the track or cars thereon, but that in passing he happened to see that the car was fastened upon the track and that the switch should be released in order to extricate it. In passing upon the question, the Court held that Bradley himself being without authority to remedy the existing condition of the switch, he could not issue orders to Nicholson to act as his helper, following the case of Southern Ry. Co. In Kentucky v. Pope's Adm'r, 133 Ky. 835, 119 S.W. 237, 19 Ann.Cas. 376, in which the Court held that if, under similar circumstances, Pope chose to obey the unauthorized order of the employe, he did so at his peril and assumed all the risk involved in the labor which he voluntarily undertook.

■ As we have already shown, neither Merrill Tatum nor Melton was charged with any duty in connection with the transportation of the employes to and from their work. It was a matter of no concern to them and they had no authority to do anything in connection with it. If some of the employes had been left overnight at the scene of the work, it was no concern of theirs and, therefore, they had no authority to employ Grimes to assist in transporting any of the employes back to the warehouse in Beaumont.

■ Conceding, merely for the sake of the discussion, that an emergency did exist and that Merrill Tatum and Melton occupied the positions and were possessed of all of the authority attributed to them by the appellee, there is still another reason why they did not have the power to make the alleged contract with Grimes concerning the transportation of Jones and Gary and bind appellant thereby. The evidence was undisputed that Henry Tatum was somewhere on the premises and was available. It is also undisputed that Henry Tatum was the superintendent of the entire construction job and was the supreme authority in all matters pertaining thereto, and especially the matter of transportation. At best, therefore, Merrill Tatum and Melton were only subordinate employes, and the rule is well established that where there is a higher authority available to act for the master, such higher authority must perform the act made necessary by the emergency and no subordinate authority has power to bind the master. Texas Bldg. Co. v. Drs. Albert & Edgar, 57 Tex.Civ. App. 638, 123 S.W. 716; Riley v. Gulf, C. & S. F. Ry. Co., Tex.Civ.App., 160 S.W. 595.

The testimony concerning the material aspects of the case was without conflict and, in our opinion, appellee was not entitled to a judgment against appellant upon any theory advanced by him. We conclude, therefore, that the court erred in denying appellant's motions for an instructed verdict and for a judgment non obstante veredicto. There is no doubt the case was fully developed and we conceive of nothing that can be gained by another trial. The judgment of the court below will therefore be reversed and judgment here rendered that appellee take nothing by his suit and that he pay the costs incurred in this court and the court below.