### Gates v. Chesapeake & Ohio Railway Company.

(Decided June 20, 1919.)

Appeal from Mason Circuit Court.

1. Railroads—Injuries to Trespasser.—A railroad company subjects itself to liability if after it has undertaken the care of an injured trespasser the injuries are aggravated or the injured person's condition is made worse through its negligence.

2. Railroads—Voluntary Assumption of Burden.—The voluntary assumption of an unrequired burden under certain conditions or circumstances may impose the same obligations as the assumption of a required duty.

3. Railroads—Assuming Charge of Injured Trespasser.—After assuming charge and care of an injured trespasser the company must do so in a proper manner and without negligence, but it is not required to continue its care of the injured person until he recovers or is removed by death.

4. Railroads—Care of Injured Trespasser—If a railroad company with due care and diligence, after taking charge of an injured trespasser, places him in the care of a competent surgeon or physician or takes him to a hospital or infirmary, or sends him to his family or near relatives, it is not required to do more.

H. W. and A. D. COLE for appellant.

WORTHINGTON, COCHRAN & BROWNING for appellee.

OPINION OF THE COURT BY JUDGE QUIN—Reversing.

Does a railroad company voluntarily undertaking the care of an injured trespasser thereby subject itself to liability, if through its negligence, the injuries are aggravated or the injured person's condition is made worse?

This question, a new one in our state, is presented for our decision by the present record.

The appeal is from a judgment of the lower court sustaining a demurrer to a petition alleging:

"That on or about November 15th, 1914, while riding with a couple of friends on one of defendant's freight trains on his way to Vanceburg, Ky., to obtain employment he was thrown from said train, falling between the cars, and run over; that his left leg was cut off below the knee and hung by his skin and his right leg was badly bruised and mashed, his injuries being serious but not fatal. That after he had been thus injured and rendered wholly helpless and was bleeding profusely from both legs, the defendant, its agents and servants, assumed control and took charge of him and conveyed him from the place of his injury to the city of Vanceburg, Ky.; that on arrival at defendant's depot in said city, defendant, its agents and servants placed him on a cot and conveyed him to the office of its physician and surgeon; that the defendant, its agents and servants carelessly and negligently allowed him to remain there in an exposed condition without any surgical attention other than the bandages, which its agents and servants carelessly and negligently placed around his legs for the space of about four hours, and without any other effort to give him relief; although he was all the while protesting against this neglect and informing the defendant, its servants and agents that he was without money or resources and that his father and mother were also without money or resources and that he was at their mercy. Plaintiff further states that after defendant, its agents and serv-

ants had thus kept him in this condition for about four hours, he was by defendant, its agents and servants, transported to one of defendant's trains and by it carried to its depot in Maysville, Ky., and there left without any further effort to procure a physician or surgeon or other medical aid, and after this exposure and neglect he was in about four hours after his arrival at defendant's depot at Maysville, Ky., taken by charitable friends to Hayswood Hospital, in Maysville, Ky., where both of his legs were amputated below the knee; that in consequence of said exposure and neglect, he bled profusely before reaching said hospital and suffered great and unnecessary pain and agony of body and mind; and as a further consequence of said exposure and neglect of defendant, its agents and servants, gangrene set up in his right leg, which made it necessary for him to undergo a second operation whereby his said leg was amputated above the knee in order to save his life, and that he could and would have been spared great pain and agony of body and mind as well as said second amputation of his right leg 'but for defendant's negligent care and attention after it had assumed to take care and control of him.' "

Whether the company was under any legal obligation to furnish medical care and attention to appellant is not involved here, and we express no opinion on same. An examination of the adjudged cases and the text books on the subject indicates the closeness of the question to be decided as they appear to be about equally divided.

The following are referred to as sustaining the non-liability of the company: Griswold v. B. & M. R. Co., 183 Mass. 432, where a girl nineteen years of age, after leaving one of appellee's stations, started to cross the company's tracks and in so doing she fell and an engine passed over her legs. The fireman ran to the station to notify the station master, who telephoned for a doctor. The engineer got down from his engine and looked at the girl but did not start his engine at once, and plaintiff claimed this was unreasonable delay.

Adams & Reid v. Sou. Ry. Co., 125 N. C. 565. This case grew out of the refusal of the railroad company to pay a medical bill for services rendered three tramps, who were trespassers, and who were injured when the train ran into a washout and the train and coaches went down. The men were stealing a ride. The injured men

were carried to a station about a quarter of a mile distant and the engineer and conductor engaged the services of plaintiff to attend the injured men. It was held that defendant's servants had no authority to engage physicians to attend trespassers.

Wills v. I. & G. N. R. Co., 41 Tex. Civ. App. 58, 92 S. W. 273, is to the same effect.

In Riley v. G. C. & S. F. R. Co. (Tex. Civ App.) 160 S. W. 595, appellant's son was injured while trespassing, and in attempting to steal a ride on a freight train. Long delay in getting a physician and improper treatment caused the amputation of plaintiff's foot.

Elliott on Railroads, sec. 1265i, and Shearman & Redfield on the Law of Neg., 6th ed., sec. 10, are to the same effect, the text being based on the foregoing decisions.

Summarizing the above it will be found that in the Griswold case a recovery was sought because of the unreasonable delay in rendition of help, the court saying there was no legal duty to give assistance to the injured girl, hence, it was not the negligent performance of an assumed care. The Adams & Reid and Wills suits were for the purpose of collecting accounts for medical services rendered trespassers. The facts in the Riley case are quite similar to those here, but the court finds the evidence failed to show that appellee took charge of the injured person.

In this connection it will be seen from the petition in the present case that recovery is sought because of the negligence of appellee after it had undertaken to care for appellant; therefore the question whether the *employes* could bind the company in the employment of medical or other aid, or render it liable through the neglect of themselves or those employed by them is not involved here.

Nor. Cent. R. Co. v. The State for use of Price, et al., 29 Md. 420, seems to be the leading case on the subject, and, inasmuch as the facts appear in the opinion, we quote therefrom, at length, as follows:

"As to the conduct of the defendant's agents after the collision, in their treatment of the injured man, though apparently dead, it was strongly indicative of the grossest negligence, and an entire indifference to the most ordinary feelings of humanity.

"The deceased was taken from the pilot of the engine, apparently dead, though showing no external wound to justify the conclusion that life was in fact extinct. Without notice to his family, or to any person who would take an interest in him, or sending for a physician to ascertain his condition, he was taken into the defendant's warehouse, and there laid on a plank across some barrels, and locked up alone all night. It was remarked at the time, that the man ought to be examined, and that the place was unfit for him to be placed in. This suggestion, however, was altogether disregarded. The next morning, when the warehouse was opened, it was found that the unfortunate man had, during the night, revived from his stunned condition, and had moved some paces from the spot where he had been laid, and was found in a stooping posture, holding his right leg with his hands, dead, but still warm, having died from hemorrhage of the arteries of his right leg, which was crushed at and above the knee. It had been proposed to place him in the defendant's telegraph office, which was a comfortable building, but the telegraph operator objected, and directed him to be taken into the warehouse, a place used by the defendant to deposit old barrels and other rubbish. The physician who attended the inquest proved that he thought it likely that the deceased became conscious when reaction set in, there being no apparent injury of the skull or brain. Blood would begin to flow upon the restoration of consciousness, and the party could not have lived more than an hour or two after blood began to flow. From these facts it was clearly competent for the jury to conclude that there was negligence."

And again, "3. We are next brought to the question whether the defendant be liable for the negligence of its agents in their treatment and disposition of the deceased, subsequent to the collision. This, we think, free from doubt or difficulty. From whatever couse the collision occurred after the train was stopped, the injured man was found upon the pilot of the defendant's engine, in a helpless and insensible condition, and it thereupon at once became the duty of the agents, in charge of the train, to remove him, and to do it with a proper regard to his safety and the laws of humanity. And if in removing and locking up the unfortunate man, though ap-

parently dead, negligence was committed, whereby the death was caused, there is no principle of reason or justice upon which the defendant can be exonerated from responsibility. To contend that the agents were not acting in the course of their employment in so removing and disposing of the party, is to contend that the duty of the defendant extended no further than to have cast off by the wayside the helpless and apparently dead man, without taking care to ascertain whether he was dead or alive, or if alive, whether his life could be saved by reasonable assistance, timely rendered. For such a rule of restricted responsibility no authority has been produced, and we apprehend none can be found. On the contrary, it is the settled policy of the law, 'to give such agents and servants a large and liberal discretion, and hold the companies liable' for their acts, within the most extensive range of their charter powers.' 1 Red. on Railw. 510; Derby v. Phila. & Red. Railway Co., 14 How 468, 483. The question as to whether the agents were acting in the course of their employment, was submitted to the jury, as was done in the recent case of Whatman v. Pearson, Law Rep. 3 C. P. 422, decided Easter Term, 1868, and the defendant had no right to ask a more favorable disposition of it.''

In the later case of B. & O. R. Co. v. The State for the use of Woodward, 41 Md. 268, because of the failure of proper exceptions, the court refrained from expressing any opinion on the subject.

Dyche v. V. S. & P. R. Co., 79 Miss. 361. This was an action for the death of appellant's father. He was a trespasser and was injured by being run over by a train belonging to the defendant. After his injury he was taken from under the car and doctors sent for, but none found. It was impossible to convey him to his home in Vicksburg because traffic had been suspended for the night. He was put on a freight train and carried to a station 18 miles distant where he was met by the company's doctor, who gave him morphine and bandaged his leg, and left him with a negro boy. The injured man was carried to Vicksburg the next day on a freight train. He reached Delta, three miles from Vicksburg, at 7 o'clock; was carried to a transport boat, ferried back and forth two or more times before being landed; finally

reached the hospital at 3 o'clock in the afternoon, where an operation was performed about 6 or 7 p. m. He died the following day. The physician who performed the operation stated that the delay of the operation lessened the chances of life, and the operation should have been performed immediately after the injury. A directed verdict for defendant was reversed, the court saying:

"It is manifest, as we think, that the railroad company cannot be held liable for the original injury of the father of appellant. We think, too, that it is not liable for any negligence or want of skill of the surgeon at Tallulah, on the facts of this record, Nevertheless, we think the jury should have been permitted to pass on the acts of the company in shipping the helpless man to Tallulah, and after they brought him back. Assuming the charge of Dyche as it did, it was charged with the duty of common humanity, and the jury should have been allowed to pass upon whether or not it performed this duty. It is to be charged with no higher degree of duty than that of ordinary humanity, but the jury must settle that on the facts. We subscribe to the reasoning in the case of Railway Co. v. State, 29 Md. 439-442 (96 Am. Dec. 545), and think the authority of this case is not disturbed by Railway Co. v. State, 41 Md. 288 et. seq."

Thompson on Negligence, sec. 1744, and Beach on Contrib. Neg., 2nd. ed., sec. 215, approve the doctrine of the above, said decision being cited in support of the text. See also note to Union Pac. Ry. Co. v. Cappier (66 Kan. 649), 69 L. R. A. 513.

Kendall, Admr. v. L. & N. R. Co., 25 Rep. 793, 76 S. W. 376, is relied upon by appellee. It was alleged among other things in the petition in that case that after the accident defendant took charge of decedent and assumed to give him all necessary medical attention, but wholly failed to do so and that he died from lack of proper attention on their part.

The witnesses for plaintiff were all employes of the company and their testimony was directed to the accident and events leading up to it. There was no proof on plaintiff's behalf to support the above allegation.

According to defendant's proof, after the accident, deceased was at once placed in charge of competent surgeons and every necessary attention given him until his death two days later. While the court says:

"Deceased was plainly a trespasser and the only duty imposed by law upon the defendant was to avoid injuring him after he had been discovered in a position of peril;" and "Being a trespasser at the time of his injury, appellee was under no legal obligation to give him medical attention, but as a matter of fact they did put him in charge of competent and reputable physicians and surgeons."

It also states, "The testimony fails to support the charge that the death resulted from a lack of proper attention on the part of the defendant."

Many cases can be found on the subject of the company's duty to employes after injury, but as this is not the question before us we will not take the time to discuss them, other than taking the following excerpts from Troutman's Admx. v. L. & N. R. R. Co., 179 Ky. 145:

"We are also of the opinion that the same measure of duty and care exists when the company undertakes to assume control of the case and take charge of the injured employe, although under the conditions present at the time it might not have been under any duty to furnish such medical aid or attention, as would exist in a state of case in which in the first instance it would have been under such duty, because the voluntary assumption of an unrequired burden may impose the same obligations as the assumption of a required duty. . . .

"The courts have also found much difficulty in settling on a ground on which to rest the liability of the master in cases like this where there is no contract or statute imposing the duty of taking care of an injured servant. We think, however, it may well be put upon the ground that as it would be a cruel and inhuman act to leave a helpless servant who was injured in the course of his employment to suffer or die from want of care and attention, there is an obligation growing out of the relation of master and servant that puts upon the master the duty of taking such reasonable care of the servant as the existing circumstances will permit. . . .

"The relation of master and servant does not terminate the very moment the servant on account of some injury received in the course of his employment is made incapable of performing his duties, and the master, in the face of such a misfortune, no matter whose fault caused it, must exercise the same reasonable care to save

the servant from further harm or death that he would be required to exercise if the servant had not been injured. If the master cannot without incurring liability wantonly, recklessly or negligently inflict harm on the servant while in the performance of his duty and when he is able to look out for himself, neither should he be allowed to wantonly or negligently abandon him to suffer or die when he is helpless and dependent, merely because he has been injured.

"The duty of the master should not end with the injury, but continues until the emergency created by the injury has passed and until the servant has been placed where he will receive such reasonable care and attention as his injury demands and the surrounding circumstances will permit."

This case cites with approval Nor. Cen. R. Co. v. Price, et al., *supra.*

Analogous to the subject under discussion is the duty of railroad companies to drunken persons. For example: Fagg's Admr. v. L. & N. R. Co., 111 Ky. 30. Here the servants of the company ejected a trespasser in a drunken and helpless condition in a deep cut on a dark night, where he was killed by a train which followed, as the servants had reason to believe he would be, the railroad was held liable for his death, though the place at which he was ejected was a place at which he entered the train. The court holds that if the company's agents, to-wit, superintendent and agent, knew of decedent's plight and failed to exercise ordinary care to save his life by notifying those in charge of the train soon to pass over the track and those in charge of said train could, without hazard to the lives of passengers on it, avoid running over him the company was liable.

L. & N. R. R. Co. v. Sullivan, 81 Ky. 674, presents similar facts. Defendant was drunk and failed to pay his fare when demanded; was removed in a deep snow and fell and laid in it until he was badly frozen, thereby losing some toes, fingers and part of his heel. The company was held liable. To the same effect is L. & N. R. R. Co. v. Ellis' Admr., 97 Ky. 330.

C. N. O. & T. P. R. Co v. Marr's Admx., 119 Ky. 954, where employes of a switch crew of a railroad company saw a passenger of another company aroused from his stupor and put out of the car on the depot platform,

and a few minutes later found him drunk and sleeping between the tracks, in their switchyard, it was their duty either to see him safely out of the yard, or to watch out for him as the engine moved about; and having done neither, but merely aroused him and started him walking in the direction of the road, and shortly after run over him on a track, where he had again gone to sleep, their employer railroad company was held liable for his death.

Ordinarily a railroad company owes no duty to a trespasser until his peril is discovered, and is not liable for an injury to him, unless after his peril is discovered the injury to him may be avoided with proper care. It is not claimed appellant's peril was discovered in time to have prevented the injury, but his cause of action is predicated upon appellee's negligence in leaving him unattended for about four hours at Maysville, after having undertaken to care for him, and because of this fact the second amputation was made necessary.

Unless the acts complained of aggravated the injury or made his condition worse, clearly the company would not be liable. Having assumed charge of appellant, as alleged in the petition, it was not encumbent upon appellee to continue to care for the injured man until he recovered or was removed by death. No such duty should be imposed. But having undertaken to care for him it must do so in a proper manner and without negligence.

It is possible appellant would have suffered just as much, and the second amputation would have been necessary even though he had received prompt and proper attention. That he suffered or was compelled to undergo the second operation does not of itself fix liability upon appellee. The burden is on appellant to show, with reasonably certainty, that had he received proper care, the additional pain, suffering and second amputation could have been avoided. This may be difficult of proof, but the rights of the company must not be guessed away; there must be some evidence to support the allegation of the petition.

Had appellee, with due care and diligence, after taking charge of appellant, placed him in the care of a competent surgeon or physician, or taken him to a hospital or infirmary, or sent him to his family or near relatives and stopped there, its duty and obligation to the injured man would have then ceased—more it could not be compelled to do.

We are mindful of the argument that in ordering a reversal of the case we will be establishing a doctrine which will allow an action against a good Samaritan and let the priest and Levite go free.  But such is not the case—just the contrary being true.  From the narrative as recorded by the Gospel writer, we find that the necessities of the one who had been so roughly handled by the thieves, on his way from Jerusalem to Jericho, were well and carefully attended to, his wounds were bound, oil and wine poured in, transportation furnished and lodging provided—this kind of treatment negatives any suggestion of negligence.

Appellant had the right to assume that having undertaken control of him, appellee would care for him in a proper manner.  Answering then the question presented by this appeal we are of the opinion the petition states a cause of action, and that appellee rendered itself liable for such additional or further pain caused solely by its neglect, after it had undertaken to care for appellant. This is not more a rule of justice than a dictate of humanity.

The judgment is reversed with instructions to overrule the demurrer to the petition and for further proceedings not inconsistent with the views herein expressed.

The whole court sitting.