YAZOO & M. V. R. CO. *v.* LEFLAR.

(Division B. Oct. 16, 1933. Suggestion of Error Overruled Nov. 27. 1933.)

[150 So. 220. No. 30700.]

Burch, Minor & McKay, of Memphis, Tennessee, for appellant.

Jno. **T. Smith**, of Cleveland, and **Walter D. Jones**, for appellee.

258

Argued orally by **Clinton H. McKay**, for appellant, and by **Jno. T. Smith**, for appellee.

**Ethridge, P. J.**, delivered the opinion of the court.

James W. Leflar sued the Yazoo & Mississippi Valley Railroad Company for a personal injury inflicted upon him by a running train of the appellant, and for neglect to give him attention after the infliction of said injury.

The declaration contains two counts, in the first of which it was alleged that at or about six A. M. June 12, 1932, the plaintiff was near Rosedale, Mississippi, and started toward home, walking, as was the custom in that community, along the defendant railroad company's track, it being the shortest and most convenient way home, and that this custom was well known to the railroad company, its agents and employees. That he walked south about one-half mile on the track and came to a public highway crossing thereon; continued to walk southward a little less than three hundred yards when one of the defendant's passenger trains overtook and struck him,

breaking his leg below the knee and otherwise seriously, severely, and permanently injuring him. That there was a strong wind blowing from the south, and that plaintiff did not and could not hear said train approaching until it was almost upon him; that the railroad track at that point is almost straight, and that if the agents and employees of said company had been on the lookout for said crossing, as it was their duty to do, they did see, or had a clear and unobstructed view of, plaintiff's position of peril; that defendant's agents did not ring its bell or blow its whistle, nor give any other signal of its approach, and the plaintiff was not aware thereof until an instant before he was struck; that he then made every effort to escape, but without avail. That plaintiff was struck within three hundred yards of a public highway crossing, and that the bell was not rung, nor the whistle blown continuously for three hundred yards before reaching said crossing, and until said crossing was passed, and that if this had been done the plaintiff would not have received the injury.

In the second count plaintiff realleges all the allegations of the first five paragraphs of the first count, and then alleges that after his injury the plaintiff was taken in charge of the defendant, and it then became their duty, as a matter of law and of common humanity, to remove him to a place where he could receive medical treatment, and to do so within a reasonable time. That it was the defendant's duty to have carried plaintiff to Rosedale, about one and one-half miles from the place of the injury, and where there was a hospital and a number of skilled physicians, one of whom is a railroad physician, and that if this had been done he would not have suffered so intensely, and the amputation of his leg might have been avoided. The delay of time involved, it is alleged, rendered this necessary. It is further alleged that he was in a helpless condition, and that he was placed on a wooden cot which had a railing three inches high around

it, and that the plaintiff's leg that had been broken was left hanging therefrom causing him much additional pain and suffering. Plaintiff alleges that when they arrived at Beulah, four miles from the place of the injury, the plaintiff insisted on being put off so that he might procure a physician and receive the needed medical attention; but that, notwithstanding said request and the dictates of common humanity, the agents of defendant refused to procure a physician or to put the plaintiff off at that point. He alleged that after the train left Beulah it proceeded south to Lobdell, and that his condition was again wholly ignored by defendant; that at Benoit the train again stopped and said defendant refused and declined to call a physician; that the next stop of the train was at Scott, where there were skilled physicians, but the defendant refused to call same; and when the train again stopped at Lamont, the defendant again failed and refused to have medical treatment furnished to the plaintiff. There was another stop at Winterville, where there were physicians, but they were not called, and that when the train reached Greenville, after this delay, a physician was called, but, at that time, he could do nothing because of the plaintiff's weakened condition caused by the loss of blood and the stopping of the circulation through his injured leg, and the long delay in calling a physician, and he stated that, because of these facts, and because of plaintiff's condition, it was impossible to save same, and his leg was amputated the following day.

The testimony of the plaintiff was to the effect that on the morning of the injury he had gone from his home toward Rosedale, in company with a lady, another white man, and two negro musicians, who had attended a dance at the home of the plaintiff, said musicians making the music therefor; that he and said parties went to a garage about one mile south of Rosedale, where the lady was visiting parties, and where the plaintiff sometimes worked

in a garage when there was work to do. It appears that the dance lasted all night, and that the plaintiff had drunk about one-half pint of liquor, and the lady testified that he was not drunk; that after reaching this garage he turned toward his home and walked down the railroad track; that he did not hear the approaching train, nor hear the whistle blown, nor the bell rung, but the first knowledge he had of its approach was the trembling of the track; that he jumped to escape his peril, but was struck and his leg broken, and remained unconscious until shortly before Beulah was reached when he recovered consciousness, and begged to be put off so that he could procure a physician to attend his injuries; but this was not done, and no first-aid treatment was received by him, and nothing was done, not even washing and dressing the wound, or to staunch the flow of blood; that the bone of the broken leg was protruding, and that it was bleeding profusely. He further testified that his mother lived near Beulah, and the physician there was a competent one, living within one hundred yards from the depot, and was his family physician; that he suffered intensely, and was placed on a cot in the baggage car, with his injured leg hanging over the side thereof; that he reached Greenville at 7:30 and was carried to the hospital at 8:30, and was given treatment and his leg was set, and on the following day his leg was amputated.

The defendant's testimony showed that the train left Rosedale at six A. M. and proceeded south; that above the place of the injury there is a one-mile curve; that the engineer's view was obstructed, and that he could not see until the train left the curve; that they were going about thirty miles per hour, and that after getting on the straight track the engineer could see something which looked like a bundle of overalls between the cross-ties just outside the rail, and on seeing this he blew the whistle, and that the plaintiff then raised his head and rolled out from the track; that he could not say whether

the engine struck him or not; that he was within about one hundred seventy-five yards from plaintiff when he first saw this object on the railroad track; and that he did all he could to stop the train.

The fireman testified it was his duty to keep a watchout ahead, and that he could see across the space made by the curve, and that he could see no person walking down the track on the occasion in question, and did not see plaintiff, or any other person, on the track at that time.

The defendant showed, by the testimony of its crew, that when the plaintiff was struck and the train was stopped, that it had passed one and one-half car lengths beyond where the plaintiff was found; that they went to where the plaintiff was and he stated he thought he had been injured by being thrown from a truck or car. They testified that other people came there shortly after the train stopped, and plaintiff, on being questioned, repeated answers to that effect. That plaintiff was then placed in the baggage car on a cot and carried to Greenville; that the injury occurred shortly after six A. M.; that the train reached Beulah at 6:15, and that the engineer told the conductor that the plaintiff needed a physician, and the conductor asked the station agent at Beulah if there was a railroad physician there, and the agent said there was not, and that they did not ask for another physician, but merely for a railroad physician. They testified that they conferred about the matter and decided that the best thing to do was to carry plaintiff to the hospital at Greenville where he could receive proper attention; that they did not inquire for a physician at any other station between Beulah and Greenville; and that on arriving at Greenville they telephoned for a physician, and a physician came after the plaintiff in an ambulance and carried him to the hospital. They denied that the plaintiff requested to be put off at Beulah.

A physician living at Beulah testified that he lived within one hundred yards of the depot, and that he was

the family physician of the plaintiff's family; that he had been a practicing physician for thirty years, having had a number of years' experience in the penitentiary hospital of Arkansas, and had much experience with broken bones, but had not treated any such at Beulah during the five years he had been living there. He further testified that, under the facts disclosed, the plaintiff should have had first-aid treatment, his wounds dressed and the blood staunched, and the pain relieved; and that, had the plaintiff been put off there, the necessity for amputation might have been averted, or, at least the chances would have been lessened; that he could not know absolutely that the amputation would not be necessary, but that proper and prompt treatment would have greatly lessened the necessity for an operation.

The two negro musicians were not introduced by either party, and the white man had removed from the state. The plaintiff testified that he tried to induce him to stay until the trial of his case, but that he stated he had to go, and this was while the plaintiff was in the hospital.

There were several witnesses introduced who testified to hearing the whistle blow prior to the injury; one, a negro woman testified that she was looking and could see the track ahead of the train from the time the whistle blew until the injury, and that there was no one walking on the track; that she could have seen any object taller than a dog, and she thought she could have seen a dog if he was on the track.

Other witnesses did not notice the track, but heard the whistle blow, but were not paying any attention to that and did not look until they heard the brakes applied, and that they then looked and did not see the plaintiff, but they went down there after the injury and testified as to the condition of the plaintiff; some of them as to statements made by the plaintiff as testified by the conductor and engineer.

The testimony of all the parties shows that plaintiff's

leg was bleeding from the time the train stopped until they reached Greenville, which was about one and one-half hours, and some of the witnesses said that when they went to where the plaintiff was after the injury, his pants were wet with blood, and that some of the blood had dried.

There is no testimony to show that the plaintiff was thrown from a car or truck. The only testimony in reference thereto, except the statement made by the railroad crew, shows that he was not so injured. At the time he was found he was between the public highway to the north of his home and the dirt crossing of what appears to be a plantation road to the south of the place of his injury; and there is no evidence or sign to show that he dragged himself from the highway to the place where he was when the train stopped.

The jury returned a verdict of five thousand dollars, and judgment was entered accordingly, from which this appeal is prosecuted.

The railroad company requested a peremptory instruction as to each of the counts, which was refused.

We deem it unnecessary to discuss the assignments with reference to the first count. The law is well settled, and the only question is as to the facts.

As to the second count, we think an opinion should be written.

In Dyche v. Vicksburg, S. & P. R. Co., 79 Miss. 361, 30 So. 711, it was held that where the railroad assumed care of an injured party, although such party was a trespasser, it was charged with the duty of common humanity, and that the jury should have been allowed to pass upon whether or not it performed that duty. In that case, Dyche, a trespasser, in attempting to ride upon the train without authority, was standing at the rear of the caboose, when the switching operation shoved the caboose against him, running over his leg and crushing it. This occurred at Delta, Louisiana, and, no physician being

found there, Dyche was carried to Tallulah, Louisiana, and was met there by a physician, who gave him morphine and bandaged his leg, and left him in charge of a negro boy who had been engaged to stay with him. The following day, on the physician's advice, he was carried to Vicksburg to the hospital, where he died the next day. The court held that the railroad company was not liable for the injury under the circumstances disclosed in the case, but that the company was liable for neglecting to treat Dyche with common humanity, and approved the case of Northern Cent. Ry. Co. v. State, 29 Md. 439, 96 Am. Dec. 545.

In Hughes v. Gregory Bus Lines, Inc., 157 Miss. 374, 128 So. 96, 97, Judge GRIFFITH, speaking for the court, said: "When a passenger becomes sick or is injured while en route, no matter how free the carrier may be of any blame in respect to the sickness or injury, the carrier owes to the passenger the consideration and care of common humanity, and if the carrier neglects that care which the enlightened sentiments of common humanity would dictate, and by reason of that neglect after the injury has occurred the passenger suffers damage, the carrier is liable. It is the duty of the carrier to see to it that the passenger is placed where he can receive proper treatment, and with reasonable promptness, and not leave him in a helpless condition lying on the floor suffering the tortures of an injury such as is shown in this case. The above language is closely paraphrased from that found in Railroad Co. v. Byrd, 89 Miss. 321, 42 So. 286, and no further authority is necessary, but the following cases are also to the same effect: Eidson v. So. Ry. Co. (Miss.), 23 So. 369; Atchison, T. & S. F. R. Co. v. Weber, 33 Kan. 543, 6 Pac. 877, 52 Am. Rep. 543; R. R. Co. v. Salzman, 52 Ohio St. 558, 40 N. E. 891, 49 Am. St. Rep. 745; Conolly v. R. R. Co., 41 La. Ann. 57, 5 So. 259, 6 So. 526, 3 L. R. A. 133, 17 Am. St. Rep. 389; Middleton v. Whitridge, 213 N. Y. 499, 108 N. E. 192, Ann. Cas. 1916C, 856."

In the case at bar, it was manifest that the plaintiff needed prompt medical attention to have his wounds dressed and the blood staunched, and his pain eased. The railroad employees recognized this fact; the engineer stating to the conductor that the plaintiff needed medical treatment, and they testified that, failing to secure a railroad physician at Beulah, they did not inquire as to any other physician.

It seems to us that, whether a physician was obtainable or not, they could have done something to staunch the flow of blood and cleanse the wounds of dirt, etc., and not wait until they reached Greenville and until a physician could be secured. Under the circumstances disclosed in the evidence it was the duty of the railroad employees to try to secure medical treatment or first aid treatment as early as was reasonably possible.

We are further of the opinion that the plaintiff had the right to be put off at Beulah, as he testified that he requested this to be done, and which testimony the jury evidently believed, although there was a conflict in regard thereto. Conceding that the railroad company owed him nothing but the duty of common humanity, his condition disclosed that he was in need of prompt medical treatment, and his testimony disclosed that he had reached his destination, and that the train crew was informed thereof, and that he requested to be put off. It was neglect on the part of the railroad company to ignore this request and take him to Greenville to secure medical aid.

An injured party would have the right to be put off at or near his home, where he could have the assistance of his relatives and friends, and it was the duty of the railroad company, when requested by the plaintiff to do so, to put him off at that place.

The proof shows that the amputation of his leg resulted from the excessive loss of blood and the failure of the blood vessels, after the long lapse of time between the injury and treatment, to properly circulate and nourish

the wounded parts; and that the amputation might not have been necessary had prompt medical attention been given.

The appellant relies upon the case of New Orleans & N. E. R. Co. v. Humphreys, 107 Miss. 396, 65 So. 497. In that case, the injured party, a trespasser, was taken off at Poplarville and a physician summoned. The company owed him no duty other than to place him in the hands of a physician competent to treat him. This physician advised that he be sent to Hattiesburg, and did not give him the treatment he could have given him. That case in no way conflicts with what we have said before. Had the railroad company's employees put the plaintiff in the case at bar off at Beulah, and summoned a physician, that case would be in point.

It seems to us that a man of ordinary intelligence would know that a person injured as the plaintiff in the case at bar was, bleeding as he was, needed immediate attention by a physician, and this attention should have been secured at the earliest reasonable time. It may be that they thought he could be carried to Greenville without serious consequences; but it is hard to see how a reasonable mind could think such a trip, without temporary relief, would not involve serious consequences. It would, at least, force the plaintiff to undergo the long period of suffering and loss of blood.

We have carefully read the instructions for the plaintiff and the defendant on the second count, and we find no reversible error in them. The judgment of the court below is therefore affirmed.

Affirmed.