94 So.2d 120 (1957)
Corlnne DUBROCA, Wife of and James R. MARSALIS,
v.
Shelby P. LA SALLE, d/b/a Second Street Food Store.
No. 20676.
Court of Appeal of Louisiana, Orleans.
March 11, 1957.
Rehearing Denied April 15, 1957.
Writ of Certiorari Denied June 10, 1957.
*121 McDonald & Buchler and Roy L. Price, Metairie, for defendant-appellant.
Claude F. Kammer and William V. Dunne, New Orleans, for plaintiffs-appellees.
*122 McBRIDE, Judge.
Plaintiffs bring this suit for damages against Shelby P. LaSalle, the defendant, as a result of Mrs. Marsalis' having been bitten or scratched by a Siamese cat on January 12, 1953, in a store in Jefferson Parish, of which the defendant is proprietor, the occurrence having taken place while Mrs. Marsalis, who was accompanied by her husband, was shopping. The cat is the pet of defendant's minor son. Mrs. Marsalis is asserting her claim for personal injuries and her husband is seeking reimbursement of the costs of the medical treatment of his wife. From a judgment in favor of plaintiffs, defendant appeals.
While the testimony on the point is in conflict, we believe that it preponderates to the effect that after Mrs. Marsalis sustained her injury, Marsalis requested defendant to keep the cat under observation for fourteen days until it could be determined whether the animal was rabid and what medical precautions Mrs. Marsalis should take against being infected by rabies. We quote Marsalis' words:
"Then I asked Mr. LaSalle to lock the cat up for 14 days, and we had a little discussion about the time element relative to keeping a cat up that had bitten someone to note its condition after that period of time, and I asked him to be sure and lock it up, because I didn't want my wife to take rabies treatment because there were numerous cats in the neighborhood that were reported rabid in the Jefferson Herald and Times, and a number of the papers, and there was quite an incident
* * * * * *
"I asked him to keep the cat up, to lock it up, and he said he would. * * *"
The defendant denies there had been any such conversation regarding the restraining of the cat for the purpose of observation, and his testimony is that neither Mr. nor Mrs. Marsalis considered the injury dangerous. He quoted Mrs. Marsalis as having said:
"Oh, it is nothing; don't worry about it."
We do not doubt that the defendant and his wife, she having been present in the store when the incident occurred, well knew of the serious consequences that could arise from the bite of an animal, nor do we doubt that they agreed to be cooperative in the matter by observing the state of health of the cat during the period of incubation of rabies. At one point we find Mrs. LaSalle let slip this significant statement:
"Well, I think my husband notified me not to let it out and I have got that much sense to know that if a cat ever scratches anybody"
According to her statement the cat stayed:
"* * * indoors where we always kept it on the opposite side of the grocery, it's a basement house, and part of the basement is the store and the opposite side is our domicile and that's where he was. He was supposed to be at all times."
At any rate, on the evening of the fourth or fifth day after the episode in the grocery store the cat escaped and the only explanation given is by Mrs. LaSalle, who testified that this occurred as she and some friends were making their exit via the basement door. The cat was gone for about a month, and in the meantime its whereabouts was not known. Upon returning home the animal gave no evidence whatever of being infected.
Two days after she had sustained the injuries, Mrs. Marsalis sought advice from her friend and neighbor, Dr. Homer Kirgis, whose specialty is in the medical field of neurosurgery. He thought Mrs. Marsalis should first determine whether the cat had been inoculated and then consult *123 her family physician. When it was learned a few days later that the animal had strayed from defendant's premises, Dr. Kirgis urged Mrs. Marsalis to see her family doctor and admonished her to contact the Pasteur Treatment Ward of the Charity Hospital in New Orleans. However, Dr. Kirgis subsequently undertook to administer the Pasteur treatment himself at his home, the first injection being made about January 23, 1953. This treatment consists of a number of injections of a prophylactic vaccine for rabies and we are informed that some persons are extremely allergic to the serum. Mrs. Marsalis was evidently in this category as she suffered a noxious reaction to the serum which brought about some ill effects.
In his reasons for judgment the trial judge said:
"* * * This cat had not previously bitten or scratched anyone and ordinarily was a gentle, well behaved pet. While the cat should have been under observation to determine whether or not it had rabies it escaped from the defendant's home, the defendant's explanation of said escape being that the cat got out one night while he and his wife and another couple were preparing to leave to go out to dinner. * * *
"The Court holds that the defendant is liable both as a result of the relationship to the plaintiffs as store-keeper and customer and because of the even more proximate cause of the injuries which resulted from the defendant allowing the cat to escape. Obviously it was the defendant's duty to use a high degree of precaution and care in order that the cat might be kept under observation and this he failed to do."
It is uncontroverted that there is no liability in defendant merely because the cat bit or scratched Mrs. Marsalis. Never before had the animal exhibited any vicious traits or tendencies and it had been, as the court found, a gentle and well-behaved pet and defendant was guilty of no negligence in allowing it to frequent his premises.
The law applicable to the owning and harboring of domestic animals and the liability of the owner or harborer thereof is well settled to the effect that when such animal suddenly and without prior warning displays a vicious nature, the owner or harborer is not liable in damages. But if in the past there has been any occurrence which is sufficient to have given notice that the animal is vicious or dangerous, then there is liability in the owner or harborer for such damage as may be caused by the animal. Tillman v. Cook, La.App., 3 So. 2d 230; Thomas v. Pecoraro, La.App., 164 So. 435; Woulfe v. D'Antoni, La.App., 158 So. 394; Anderson v. D'Ingianni, 16 La. App. 560, 134 So. 412; White v. Sens, 13 La.App. 343, 127 So. 413.
In Mercer v. Marston, 3 La.App. 97, we said:
"* * * it is clear that liability rests on two bases, namely:
"1. Injury by an animal; and
"2. Fault or negligence on the part of the owner."
We stated in Perez-Sandi v. Berges, 12 La.App. 191, 125 So. 185, 186:
"* * * previous knowledge of the vicious tendency of an animal was necessary to hold its owner answerable in damages. This is our appreciation of the present state of the law in Louisiana, * * *."
From the reasons for judgment it is evident that the trial court was of the opinion that this rule of law does not apply in the case of a storekeeper and that because the relationship of storekeeper and customer existed between the parties the defendant is liable. This was an erroneous conclusion. The keeping of a domestic animal per se in a place of business does not constitute negligence and is insufficient to render the proprietor liable in damages. *124 All the law exacts of a storekeeper is that he keep his premises in a reasonably safe condition and use ordinary care with respect to patrons and others lawfully in his place of business. The defendant not having had notice or knowledge that the animal possessed vicious tendencies or that persons entering his business establishment would be exposed to danger because of the animal's presence, he is not liable.
The trial judge also concluded that there was liability in defendant for having failed "to use a high degree of precaution and care in order that the cat might be kept under observation." This conclusion is the focal point in the case.
The general basis of the law of tort in Louisiana is found in LSA-C.C. art. 2315 which in part reads as follows:
"Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it; * * *."
Under our jurisprudence negligence is actionable only when it is the violation or disregard of some legal duty. In Prescott v. Central Contracting Co., 162 La. 885, 111 So. 269, 270, the Court said:
"* * * it is a well-recognized rule of law that negligence is the violation or disregard of some duty."
The Supreme Court in P. Olivier & Sons, Inc., v. Board of Com'rs of Lake Charles Harbor and Terminal Dist., 181 La. 802, 160 So. 419, 420, made this observation:
"A tort is a private wrong, independent of contract. It is a breach of legal duty, * * *."
In Weadock v. Eagle Indemnity Co., 15 So.2d 132, 138, the Court of Appeals for the Second Circuit had this to say:
"Every tort action embraces three distinct elements, viz.:
"1. Existence of legal duty from defendant to plaintiff;
"2. Breach of that duty, and
"3. Damage as a proximate result."
Unless a man is responsible for another person's injury or distress, ordinarily he is under no legal duty or obligation of giving him aid, help or assistance, or to go to his relief.
It is a well-recognized principle of law that:
"One who sees another in peril, for which he is in no way responsible and which is entirely disconnected from any agency or instrumentality with whose control he is concerned, is not under any legal obligation to attempt to rescue such person, * * *." 65 C.J.S., Negligence, § 57, p. 550.
In Plutner v. Silver Associates, Inc., 186 Misc. 1025, 61 N.Y.S.2d 594, 595, it was said:
"Concededly, there is no legal duty to offer relief or assistance to one who is sick or injured. It is true that there may be a strong moral and humanitarian obligation to furnish such aid and assistance under ordinary circumstances, but from time immemorial our courts have held that there is no legal responsibility so to do."
In Buch v. Amory Mfg. Co., 69 N.H. 257, 44 A. 809, 810, the Court made these interesting remarks:
"* * * Actionable negligence is the neglect of a legal duty. The defendants are not liable unless they owed to the plaintiff a legal duty which they neglected to perform. With purely moral obligations the law does not deal. For example, the priest and Levite who passed by on the other side were not, it is supposed, liable at law for the continued suffering of the man who fell among thieves, which they might, and morally ought to have, prevented *125 or relieved. Suppose A., standing close by a railroad, sees a two year old babe on the track, and a car approaching. He can easily rescue the child, with entire safety to himself, and the instincts of humanity require him to do so. If he does not, he may, perhaps, justly be styled a ruthless savage and a moral monster; but he is not liable in damages for the child's injury, or indictable under the statute for its death. * * *"
But there is a rule of law which is just as well recognized:
"* * * that one who voluntarily undertakes to care for, or to afford relief or assistance to, an ill, injured, or helpless person is under a legal obligation to use reasonable care and prudence in what he does. In such case the measure of the duty assumed is to exercise ordinary or common humanity, or to exercise with reasonable care such competence and skill as he possesses, or to exercise such care in the treatment of the injured person as the circumstances will allow; and the person who undertakes the care is liable if the existing injuries are aggravated or other injuries are caused by a lack of this measure of care." 65 C.J.S., Negligence, § 58, p. 551.
In Restatement of the Law of Torts, Vol. 2, p. 881, the rule is stated thus:
"One who gratuitously undertakes with another to do an act or to render services which he should recognize as necessary to the other's bodily safety and thereby leads the other in reasonable reliance upon the performance of such undertaking
"(a) to refrain from himself taking the necessary steps to secure his safety or from securing the then available protective action by third persons, * * *
is subject to liability to the other for bodily harm resulting from the actor's failure to exercise reasonable care to carry out his undertaking.
"Comment:
"a. The actor may undertake to do an act or to render services either by an express promise to do so or by a course of conduct which the actor should realize would lead the other into the reasonable belief that the act would be done or the services rendered. * * *"
This principle has been given application by the courts of several jurisdictions in a variety of cases.
L. S. Ayres & Co. v. Hicks, Ind., 40 N.E. 2d 334, rehearing denied 220 Ind. 86, 41 N.E.2d 195, 356, a storekeeper who was not responsible for the initial injury failed to exercise reasonable care to avoid aggravation; Carey v. Davis, 190 Iowa 720, 180 N.W. 889, 12 A.L.R. 904, where defendants negligently moved a laborer unconscious from heat to another place where he was exposed to increased heat and then abandoned him; Owl Drug Co. v. Crandall, 52 Ariz. 322, 80 P.2d 952, 120 A.L.R. 1521, defendant in seeking to assist plaintiff who had fallen negligently allowed her to sustain a second fall; Dyche v. Vicksburg, S. & P. R. Co., 79 Miss. 361, 30 So. 711, defendant undertook to convey plaintiff to a hospital but was tardy in doing so; Silva v. Providence Hospital of Oakland, 14 Cal. 2d 762, 97 P.2d 798, a charity hospital was held liable to a person already injured but who fell and sustained further injury as a result of the negligence of a nurse; Gates v. Chesapeake & O. Ry. Co., 185 Ky. 24, 213 S.W. 564, 5 A.L.R. 507, an injured trespasser allowed recovery from railroad which volunteered help but negligently cared for him; Yazoo & M. V. R. Co. v. Leflar, 168 Miss. 255, 150 So. 220, a railroad was held to be negligent for failing to obtain prompt medical aid for person injured by train; Clark v. State, 195 Misc. 581, 89 N.Y.S.2d 132, unreasonable delay in securing medical attention for an injured person of whom defendant had taken charge.
*126 Our belief is that the above-discussed rule with respect to the duties of one who voluntarily undertakes to care for or to afford relief or assistance to an injured or distressed person is broad enough to have full application to the instant case. Perhaps the defendant, LaSalle, initially owed no duty whatever to Mrs. Marsalis, but when he once agreed to restrain and keep the cat under observation, he was bound to use reasonable care and prudence in doing so and to assume and exercise reasonable care and common humanity. It may be that Mrs. Marsalis had open to her some other course by which she could have had the cat incarcerated and examined in order to determine if it was rabid, but she unquestionably and in good faith relied upon defendant to carry out the agreement which he voluntarily made, thus foregoing such other possible available protection. It was of extreme importance to know if the cat had rabies so she could regulate her course of conduct with reference to the injury. We do not doubt for one moment that both defendant and his wife were fully cognizant that such injures could be quite serious and exceedingly dangerous in the event the offending animal was infected with rabies. In fact we feel sure of our ground in saying this because of the statement of Mrs. LaSalle: "I have got that much sense to know that if a cat ever scratches anybody."
LaSalle's liability would then depend on whether he used reasonable care with reference to keeping the cat, for as it developed later the Pasteur treatment was entirely unnecessary and the escape of the cat was the direct and proximate cause of the necessity for the injections and the ill effects which Mrs. Marsalis suffered as a result thereof.
Neither defendant nor his wife took any especial steps or means to prevent the cat from straying from their premises. The cat, which was three years old, had always been kept in the basement and was allowed access to the yard from time to time. No change whatever in the animal's usual routine was undertaken and we must hold that defendant failed to use ordinary or reasonable care to see to it that the animal was kept secure, and, hence, defendant is liable unto plaintiffs for whatever damages they sustained as a result of such lack of care.
Mrs. Marsalis tolerated the vaccine very well until the fifth or sixth injection when fever developed. Upon the thirteenth injection she claimed some additional discomfort, particularly a generalized aching. Dr. Kirgis states that when the fourteenth and last injection was administered, Mrs. Marsalis claimed to feel slightly worse although she did not appear to be seriously uncomfortable at the time. Shortly afterward Mrs. Marsalis developed nausea, headache and soreness of the neck and became somewhat disoriented. It was about this time that she consulted Dr. Walter Mattingly, her family physician, and was sent to a hospital on February 8, 1953, and remained there for an initial period of three days, was readmitted about a week later and remained in the hospital for eight more days. The only medical attention Mrs. Marsalis received at the hospital was by Dr. Mattingly and his assistant, Dr. Dean. Dr. Kirgis states he called to see Mrs. Marsalis a few times while she was hospitalized, but it clearly appears that these visits were on a friendly and not a professional basis.
For some reason or other which is totally unexplained, plaintiffs saw fit not to call either Dr. Mattingly or his assistant as witnesses, notwithstanding the testimony of the two physicians was material insofar as the case for the plaintiffs was concerned. The trial judge even warned plaintiffs of this. At one point the judge asked counsel: "* * * do you intend to call Dr. Mattingly as a witness?" and the reply was: "No, sir." Later on during the trial the court said: "Let's get over this. You want more on the hospitalization. You better get Dr. Mattingly and have him testify."
*127 Dr. Kirgis testified that prior to her first confinement in the hospital, one of the patient's major complaints was of headaches and fever. He mentioned something about a spinal puncture being made in the hospital and stated that Mrs. Marsalis also had a paralytic ileus and paralysis of the intestines, this latter condition causing a distention of the abdomen. He also said her processes of elimination were affected.
But Dr. Kirgis could not with any degree of certainty or finality ascribe any of these symptoms to a reaction to the Pasteur injections. When asked to give his opinion, Dr. Kirgis said:
"Well, I don't think anyone could say that it absolutely, unequivocally is a result of the Pasteur treatment."
He was also asked if he would say the same for the abdomen and bladder condition and his answer to that was:
"Yes, I feel that it is, but Ithere's no way of definitely proving it."
On his direct examination the doctor was asked the question whether he felt the Pasteur treatment was the direct cause of plaintiff's condition and he gave this answer:
"Well, I wouldn't just say dogmatically that it is, but I would say that it might be."
In answer to a question by the trial judge as to whether an examination would reveal that the plaintiff's complaints were not associated with the Pasteur treatment, Dr. Kirgis answered:
"No, I don't think that it could be established that they are not associated with it. The point that I was making was that an examination, I think, would definitely establish objective evidence of disfunction of the bladder and of the intestines. Now, what could not be definitely established would be whether or not it absolutely was the result of those injections."
Dr. Mattingly and his assistant, Dr. Dean, as the attending physicians, we believe, were the proper and only witnesses who could testify as to Mrs. Marsalis' complaints and the course of treatment given her, and their testimony would have shed much light on this as well as her previous medical history. It is not at all unreasonable to assume that such a disclosure as might have been made by Dr. Mattingly and his assistant would have facilitated in the determination of whether there was a causal connection between the Pasteur treatment and the alleged results complained of. There is embedded in the jurisprudence of this state a doctrine that the failure of a litigant to call a material witness creates a strong presumption that his testimony would not have aided the litigant's cause, but rather would have been detrimental to it. Certainly in the face of this presumption of law and the admitted uncertainty of Dr. Kirgis as to whether there was a causal connection between the Pasteur treatment and Mrs. Marsalis' complaints, we do not believe that this court could possibly hold that the plaintiffs have established that all of the complaints alleged by Mrs. Marsalis were the direct result of the injections administered by Dr. Kirgis.
However, Dr. Kirgis' testimony is sufficient to show that Mrs. Marsalis reacted unfavorably during the course of the injections, and it appears that she suffered headaches, fever, disorientation and nausea, and, of course, she is entitled to recover damages from the defendant, not only because she was compelled to submit to the fourteen injections, but also because of the effects of her reaction. The trial judge set her recovery at $3,000, but we believe that this award is excessive in view of the failure of Mrs. Marsalis to prove that her hospital stays and the attention rendered her by Dr. Mattingly were a result of the administration of the Pasteur injections.
*128 In the case of Serio v. American Brewing Company, 141 La. 290, 74 So. 998, L.R.A. 1917E, 516, the Supreme Court allowed a plaintiff who had been bitten by a dog the sum of $1,000 in compensation for his suffering from the protracted effect of the Pasteur treatment upon his nervous system. Using that case as a guide, we believe that an award of $1,500 to Mrs. Marsalis in the instant case would be doing substantial justice.
Marsalis recovered judgment for the sum of $355.95, which consisted of $72.30 for drugs, hospital expenses $259.65, and for the fees of professional nurses $24. We believe his recovery should be limited solely to the amount expended for drugs, $72.30, as there is no proof that the hospital expenses or the nurses' fees were incidental to the reaction to the Pasteur treatment. Only Dr. Mattingly and his assistant, Dr. Dean, could have enlightened the court with reference thereto. There is no evidence whatever showing what amounts, if any, were expended for doctor bills.
Therefore, the judgment appealed from is amended so as to reduce the award to Mrs. Marsalis to the sum of $1,500 and reducing the award to James R. Marsalis to the sum of $72.30, and as thus amended and in all other respects, the judgment is affirmed; the costs of appeal to be paid by plaintiffs.
Amended and affirmed.
REGAN, Judge.
I respectfully concur. In my opinion the record amply supports the award made by the trial judge, and therefore it should not have been disturbed by this court. Dr. Kirgis, a specialist in diseases of the central nervous system, and rabies being an infectious disease of the central nervous system, in my opinion was eminently qualified to evaluate the damages incurred by plaintiff by virture of the deleterious effects resulting from the injection of rabies vaccine.