MILLER, Judge pro tem.
Saxton Farmer seeks to recover for damages to his building which allegedly resulted from lightning. Plaintiff admittedly had coverage for damages resulting from lightning under policies purchased from the five defendant insurance companies, Badger Mutual Insurance Company, American Manufacturers Mutual Insurance Company, Potomac Insurance Company, Norfolk & Ded-ham Mutual Fire Insurance Company and Reliance Insurance Company.
Plaintiff alleges that on May 20, 1959 at about 2:30 p. m., during a thunder storm, the roof of the building was struck by lightning entitling him to damages and penalties totaling $5,564.53. Defendants contend that the building was not struck by lightning but that the roof collapsed due to improper and faulty construction together with an accumulation of water on the roof of the building. The trial judge held that plaintiff failed to prove lightning caused or contributed to the loss, and therefore denied plaintiff’s claim. The appeal presents only a question of fact.
The building is located at 315-317 East Fifth Street in the City of Bogalusa, Louisiana, and is constructed in the shape of a right triangle with the base of the triangle facing south on Fifth Street for a distance of 104.02 feet. The “altitude” side of the triangular shaped building is 170.47 feet and the hypotenuse is 200 feet less. The building has two stories along the south side, but the major portion of the building is only one story covered by a flat roof with a parapet wall at least two feet high on two sides, the third side being open for water to run off.
The point where the lightning allegedly struck was in the center of an area which was supported by a second hand eight inch “I” beam spanning a total of 29 feet inches. This “I” beam was originally in two sections, one being 13 feet 7 inches long and the other 16 feet 2 inches long. The two sections had been butt welded and the testimony shows that this was not the best method of welding such a beam for this type of installation. The “I” beam broke at the weld seam, which in turn caused the roof to collapse.
When the building was constructed in 1945, the roofing installed weighed 90 pounds per square. Because leaks developed, a much more substantial roof was installed in 1955 and it weighed over 90(1 pounds per square. When this was installed it was found necessary to add additional joists (which rested on the “I” beam) to support the added weight of the roof, but there was no brace placed under the “I”" beam to care for the added weight.
. On the morning after the roof collapsed* four photographs were made and these were introduced in evidence by defendants. These photographs revealed the situation which undoubtedly led the insurance companies to deny liability, for they show two. saucer like depressions holding water on a portion of the roof near the two-story section, and south of the hole in the roof. They further show a clean break in the “I” beam at the site of the weld.
*148 There was no showing that any part of the building had been burned, charred or scorched, or that any of the electrical circuits had been shorted out in any section of the building. The only loss of electric service was in that part which was demolished when the roof collapsed.
Mr. Murvan M. Maxwell, a registered architect, was called as an expert witness for the defendants and testified had the building been struck by lightning at the site where the roof collapsed, the steel “I” beam would have been twisted or would otherwise reflect the effects of a torsion type of stress. The photographs show very plainly the beam was not twisted, but showed a clean break at the butt weld seam. In Mr. Maxwell’s expert opinion, the eight inch “I” beam used to span the 29 feet 8% inches was inadequate for the span. In fact, he testified that the beam was barely strong enough to support its own weight. The contributory load being carried by that beam was described as an area 33 feet along the south support wall, 22 feet along the north wall, 28 and 1/2 feet along the west wall and 35 feet along the east wall. In the light of this opinion and the evidence it is difficult to understand how this “I” beam could support the many joists which in turn supported several squares of roofing weighing over 900 pounds per square for a period of some four years.
In Mr. Maxwell’s opinion the weight supported by the beam over this excessive span caused a sag or deflection which in turn caused a saucer like depression in the roof. The downpour (which tire record clearly shows to have been an unusually heavy one) caused water to build up on the roof faster than it could drain off, which in turn caused additional weight and additional deflection resulting in the failure of the weld and the clean separation of the “I” beam at the weld seam.
The plaintiff employed Pittsburg Testing Laboratory of New Orleans to make certain tests, but elected not to produce their report. Defendants subpoenaed the employee who made the examination and report for Pittsburg Testing Laboratory, but plaintiff objected to his testifying, which objection was sustained by the trial court. Plaintiff’s refusal to permit this testimony creates a presumption that the testimony of plaintiff’s expert would be adverse to plaintiff. Bates v. Blitz, 205 La. 536, 17 So.2d 816, 819; Parnell v. City of Monroe, La.App., 98 So.2d 820, 823; Marsalis v. La Salle, La.App., 94 So.2d 120, 127, and Pearlstine v. Mattes, 223 La. 1032, 67 So.2d 582.
Plaintiff relies on the testimony of four witnesses who were in the building at the time that lightning allegedly struck the building. Carol Hughes, an employee of National Cash Register Company, one of the tenants of plaintiff’s building, testified he was waiting for the heavy rain to slacken so he could leave the building and was looking south out of the large plate glass windows in the office when lightning struck the building to the north of plaintiff. He related that:
“ * * * all of a sudden there was this terrific flash of lightening that lit up the whole sky and simultaneously the roar of thunder and the whole building shook. I think the pipes rattled and dust and dirt came down all over the place and I knew right then that the lightning had struck the building some place. I don’t know where. * * *»
By cross-examination, it was made apparent that this witness did not see the lightning strike the building.
Plaintiff’s second witness, Mr. Marcel Joseph Jaffee, a salesman for National Cash Register, who calls on customers in the Bo-galusa area, described the event on direct examination in this way:
“A. I was facing the South end of the building — I was facing the North end of the building when I saw lightning — I did not see lightning — the room lit up and I heard a crash and *149 dust fell off the ceiling and the building shook.
“Q. What did you do at that time Mr. Jaffee?
“A. I had never experienced that close a crash and noise. I sat there—
I don’t know how long, maybe a minute and maybe two, and I believe Carol Hughes went outside.
“Q. Mr. Jaffee how long after this occurrence did you remain in Boga-lusa?
“A. About 10 minutes. I was due in New Orleans about 4 o’clock and I left.”
There was no cross-examination. As argued by defendants, this testimony is just as favorable to defendants as to plaintiff.
Plaintiff’s third witness, Mr. Charles Davis, was an employee of Bennie Farmer, plaintiff’s brother. He is an auto repairman, and works in the auto repair shop which occupies a portion of plaintiff’s building. Mr. Davis described the event in this way:
“I was in the paint department and I heard a loud clap of thunder and a crash overhead and I looked up and the dust was falling down and pipes was rattling and I heard a crash in the next compartment and for a moment I didn’t know what had happened so when I got my wits I run to the other side of the shop and Bennie Farmer come out of his office door and I told him I thought lightning had struck the building.”
Mr. Bennie Farmer testified:
“A. I was standing between my office door and the East door of the shop building, looking out the West door, when I heard a loud crack and the roaring of thunder. The building shook and I saw a sheet of dust drop down from the rafters like a curtain. I knew lightning had struck closer to me than it ever had before.
“Q. What happened at that time? What physical facts happened to the building, if any ?
“A. In just a few seconds I saw my painter run out fast as I ever saw him move and then some three or four minutes later I began to smell gas and I walked over to a heater to see if it was cut on and it was off and I saw water coming under the partition wall separating my shop from the store room to the North (where the ceiling gave way). I realized there was something happened back there and I went upstairs to my brother’s living quarters where I could look out over the back of the building and I saw a hole in the roof that you could run a truck in.” (Parenthetical statement added by this court.)
The fact that shortly after the roof collapsed over the storeroom water was coming under the partition separating Bennie Farmer’s shop from the storeroom confirms the theory that there was a large quantity of water over the storeroom when the roof collapsed.
In our opinion, these witnesses are absolutely convinced the roof collapsed due to one cause when the total evidence demonstrated that it collapsed for a different reason. This is not to be considered as a reflection on the integrity of the witnesses for where a series of circumstances come together to create a startling and frightening result, the immediate reaction is to look for an apparent and ready explanation. The collapse of the roof alone would unquestionably cause an unusually loud noise, the shaking of the building, and the settling of dust from the ceiling in the remainder of the building, which would naturally startle and frighten any occupants of the building. The heavy rain and thunder storm then in progress would likely condition anyone in the building to expect that lightning might strike in the vicinity and to conclude when the roof collapsed that it had.
*150 We are not prepared to say that the trial judge, who had the opportunity of hearing all the witnesses, committed manifest error in rejecting the conclusion of Mr. Hughes and the suggestion of the other witnesses that lightning struck the building. The impressive expert testimony and the photographs produced by defendants together with the refusal of plaintiff to permit his expert to testify and plaintiff’s complete failure to produce any expert testimony to confirm the conclusion of Mr. Hughes and 'the suggestion of plaintiff’s other witnesses, convinces us that the decision of the trial judge was imminently correct.
For these reasons, the judgment of the trial court is affirmed. All costs of this appeal are to be paid by plaintiff.
Affirmed.